(No. 53256.—

JAN SIEGEL, Appellee, v. ARNOLD SIEGEL, Appellant.

*Opinion filed January 20, 1981.—Rehearing denied*
*March 27, 1981.*

SIMON, J., took no part.

Sherwin & Sherwin, of Chicago (Theodore R. Sherwin, of counsel), for appellant.

Schiller & Schiller, Ltd., of Chicago (Donald C. Schiller and John F. Martoccio, of counsel), for appellee.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

Arnold Siegel (father), on January 10, 1978, filed in the circuit court of Cook County (circuit court), his peti-

tion for a rule upon Jan Siegel (mother), to show cause why she should not be held in contempt. The mother's allegedly contemptuous conduct consisted of applying to the superior court of California, County of Los Angeles (California court), for modification of the child-visitation provisions contained in the circuit court's 1972 decree dissolving the father and mother's marriage. In orders of June 12 and June 28, the circuit court found the mother in contempt and provided that all child-support payments by the father cease retroactively to January 10, 1978. The mother appealed, and the appellate court (80 Ill. App. 3d 583) affirmed the circuit court's finding that it had jurisdiction, but reversed the termination of child support and remanded the cause for a hearing on the issue of contempt. We granted the father's petition for leave to appeal.

The 1972 marriage dissolution decree awarded custody of the two children, then aged approximately 5 years and 3½ years, to the mother, with detailed visitation privileges for the father. Paragraph (h) of that judgment provided "[t]hat this Court reserves jurisdiction of the subject matter of this case and of the parties hereto for the purpose of enforcing the terms of this Judgment and the terms and provisions of the Agreement incorporated herein."

In June 1974 the mother's application to the circuit court for permission to move herself and the children to California was granted, conditioned upon the posting of a $5,000 bond guaranteeing compliance with the terms of the order, one of which was:

> "That the minor children shall remain solely under the jurisdiction of the Circuit Court of Cook County, Illinois, and both the Plaintiff and the Defendant are enjoined from petitioning any other Court for relief concerning the welfare of the minor children, or the modification of this ORDER."

In April 1976 the circuit court released the mother's bond. A dispute about 1977 summer visitation resulted in a June 29, 1977, circuit court order detailing visitation

procedures.

On December 22, 1977, the mother filed in the California court her petition seeking to domesticate and modify the visitation provisions of the circuit court's orders. Among the supporting papers filed by the mother was a report of the children's psychiatrist, Dr. Maurice Zeitlin, describing what he saw as the children's troubled relationship with their father and suicidal tendencies of the older child. The California court, on the filing date, entered an order restraining the father from harassing the mother and children or removing the children from the State of California and terminating his visitation privileges pending the court's further order. On December 29, when the father was in California to see the children, he was personally served with notice of those proceedings and directed to appear on January 11 to show cause why orders requested by the mother to limit his visitation to that recommended by the psychiatrist should not be made. The father did not appear at the hearing, and the California court ordered the judgment of the circuit court adopted as its own and modified it as requested by the mother.

On January 10, following his return to Illinois, the father applied to the circuit court for a rule requiring the mother to show cause why she should not be held in contempt for violating the June 28, 1974, and June 29, 1977, orders. He also sought a mandatory injunction requiring her to cause the California court order to be vacated and that case dismissed. On January 10 the circuit court ordered that the mother be restrained from proceeding in the California court. On February 10 the mother's attorney entered a special appearance in the circuit court, contesting the court's jurisdiction over her person and the subject matter. On that date counsel for the father filed a petition for a rule requiring the mother to show cause why she should not be held in contempt for also violating the

circuit court's January 10 order. On May 2 the circuit court "denied" the mother's special appearance and her counsel "stood on the special appearance." On June 12 the circuit court entered an order terminating child-support payments, retroactively to January 10, "until further order of this court" and set June 27 as the return date on the contempt rule. On June 28 that court entered its order finding the mother in contempt and discontinuing all child-support payments "until further order of this court." This appeal followed.

The father initially argues that the orders finding the mother guilty of contempt and terminating support payments as of January 10 are not, in the absence of the imposition of a sentence for contempt, final and appealable. We believe, however, that sanctions rendering contempt judgments appealable are not limited to fines and imprisonment. It is apparent here that the action of the circuit judge was intended, at least in part, as punishment for what he viewed as the mother's contemptuous conduct in violating that court's prior orders. In these circumstances we believe the judgment appealable. *Bulandr v. Bulandr* (1959), 23 Ill. App. 2d 299; *Szczawinski v. Szczawinski* (1962), 37 Ill. App. 2d 350.

The statutory provisions relevant to our consideration of this case are contained in the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 101 *et seq.*) (the Act), which became effective on October 1, 1977. Section 801 (Ill. Rev. Stat. 1977, ch. 40, par. 801) of the Act provides:

"Sec. 801. Application.

(a) This Act applies to all proceedings commenced on or after its effective date.

(b) This Act applies to all pending actions and proceedings commenced prior to its effective date with respect to issues on which a judgment has not been entered. Evidence adduced after the effective date of this Act shall be in compliance with this Act.

(c) This Act applies to all proceedings commenced after its effective date for the modification of a judgment or order entered prior to the effective date of this Act.

(d) In any action or proceeding in which an appeal was pending or a new trial was ordered prior to the effective date of this Act, the law in effect at the time of the order sustaining the appeal or the new trial governs the appeal, the new trial, and any subsequent trial or appeal."

It is apparent from these provisions, particularly subsections (a) and (c), that the Act is applicable to these proceedings, which were commenced subsequent to its adoption.

Prior to the enactment of the Act, it had been a basic principle of Illinois child-custody law that custody decrees were modifiable, as the best interests of the children demanded. (*Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, *cert. denied* (1980), 449 U.S. 927, 66 L. Ed. 2d 155, 101 S. Ct. 329; *Nye v. Nye* (1952), 411 Ill. 408.) Section 610 of the Act indicates that it, too, contemplates modifiable custody decrees, although it makes modification more difficult. (See *In re Custody of Harne* (1979), 77 Ill. 2d 414.) It was the general rule in Illinois, prior to the effective date of the Act, that the court which entered the original child-custody decree retained "continuing jurisdiction" of the subject matter and the parties for modification purposes. (*Sommer v. Borovic* (1977), 69 Ill. 2d 220; *Crawley v. Bauchens* (1973), 13 Ill. App. 3d 791, *aff'd* (1974), 57 Ill. 2d 360; *McClellan v. McClellan* (1970), 125 Ill. App. 2d 477; *Sharpe v. Sharpe* (1966), 77 Ill. App. 2d 295.) However, Illinois courts have never viewed "continuing jurisdiction" as limitless. This court, in *People ex rel. Strand v. Harnetiaux* (1970), 46 Ill. 2d 424, 429, denied full faith and credit to a California modification decree, noting that the desire for finality often conflicts with the best interest of the child. There a California court, in April 1967, granted custody to the father, who moved the child to Illinois. After the father was killed in a

September 1967 accident, paternal grandparents in Illinois were appointed guardians by an Illinois court. In January 1968, after registered mail notice to the grandparents, the California court modified its decree to grant the California mother custody. This court stated:

"In this case the child was taken from the plaintiff by order of the California court and has since resided in the home of the defendants, except for the month of July, 1967. Neither the child nor the defendants, however, were heard at the California hearing to grant custody to the plaintiff, and we think any determination which purports to be guided by the best interests of the child is under a serious handicap when the child and the people with whom he has been living are not present. *** Other courts when confronted with a foreign custody decree which has been modified at the request, and in favor, of a parent who is still a domiciliary of the foreign State, when the other parent and child are now domiciled in the forum State, have generally refused to grant full faith and credit to the modified decree on the ground that the foreign State no longer had jurisdiction over the other parent and child."

It directed the Illinois trial court to hold a hearing to determine custody. In *Beaulieu v. Carmack* (1978), 66 Ill. App. 3d 943, 945, 947, the court, guided by the "welfare of the child," refused to grant "full faith and credit" to a Maine modification (taking custody from the mother who had lived in Illinois two years with the child) of a Maine custody decree, even though the Maine court asserted it had continuing jurisdiction.

We believe that the decisive issue in this case is whether section 601 of the Act vitiated the circuit court's June 28, 1974, order limiting the rights of the parties to petition other courts for modification, and also indicated the con-

tinuing jurisdiction of the circuit court over the subject matter of the custody of the Siegel children should not have been exercised. Section 601 provides:

"Sec. 601. Jurisdiction—Commencement of proceeding.

(a) A court of this State competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification judgment if:

(1) this State is the home state of the child at the time of commencement of the proceedings, or had been the child's home state within 6 months before the commencement of the proceeding and the child is absent from this State because of his removal or retention by a person claiming his custody or for other reason and a parent or person acting as parent continues to live in this State; or

(2) it is in the best interest of the child that a court of this State assume jurisdiction because the child and his parents, or the child and at least one contestant, have a significant connection with this State, and there is available in this State substantial evidence concerning the child's present or future care, protection, training and personal relationships; or

(3) the child is physically present in this State and has been abandoned, or is neglected or dependent, or it is necessary in an emergency to protect him because he has been subject to or threatened with mistreatment or abuse; or

(4) no other state has jurisdiction under prerequisites substantially in accordance with paragraphs (1), (2) or (3), or another state has declined to exercise jurisdiction on its determination that this State is the more appropriate forum to determine custody of the child; and it is in the child's best interest that the court assume jurisdiction.

(b) Except under paragraphs (3) and (4) of subsection (a), physical presence in this State of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this State to make a child custody determination.

(c) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody.

(d) A child custody proceeding is commenced in the court:

(1) by a parent, by filing a petition:

(i) for dissolution of marriage or legal separation or declaration of invalidity of marriage; or

(ii) for custody of the child, in the county in which he is permanently resident or found; or

(2) by a person other than a parent, by filing a petition for custody of the child in the county in which he is permanently resident or found, but only if he is not in the physical custody of one of his parents.

(e) Notice of a child custody proceeding shall be given to the child's parents, guardian and custodian, who may appear, be heard, and file a responsive pleading. The court, upon showing of good cause, may permit intervention of other interested parties." (Ill. Rev. Stat. 1977, ch. 40, par. 601.)

We note, parenthetically, that section 601 speaks in terms of "jurisdiction" of the subject matter of child-custody determinations. Jurisdiction of the subject matter of such determinations, at least in the traditional sense, is conferred upon our circuit courts by the constitutional provision that "Circuit courts shall have original jurisdiction of all justiciable matters ***." (Ill. Const. 1970, art. VI, sec. 9.) We eliminate the possibility of confusion by pointing out that "jurisdiction" is not being used by the General Assembly in its traditional subject matter sense, but in the sense of a limitation upon the exercise of the existing jurisdiction. Despite our reservations regarding the statutory language, we believe it will be less confusing if we adhere to it, particularly since the uniform act which is now the law of Illinois speaks in similar terms.

Although, as earlier indicated, our courts have been flexible in their application of the continuing-jurisdiction theory, we believe that section 601 imposed further limitations on its operation. Sections 601(a), (b), and (c) of the Act are, as the father acknowledges, virtually identical to sections 3(a), (b), and (c), of the Uniform Child Custody Jurisdiction Act (Uniform Act) (9 Unif. Laws Ann. 122-23

(1979)), which was adopted by our General Assembly in 1979. Consequently, interpretations of those sections of the Uniform Act are relevant here. The courts of Kentucky, Maryland, Florida and Oregon have construed section 3 of the Uniform Act to deprive the court which rendered the original custody decree of its "continuing jurisdiction" at the point when the children have lost meaningful contact with the State, a construction with which we agree.

The Supreme Court of Kentucky has stated that Kentucky courts do not retain jurisdiction of custody questions indefinitely, even though a divorce court's original order might state that it retained jurisdiction. (*Honigsberg v. Goad* (Ky. 1976), 550 S.W.2d 471; *Turley v. Griffin* (Ky. App. 1974), 508 S.W.2d 764.) In those cases Kentucky courts did not entertain motions by fathers who lived in Kentucky for modification of custody decrees after the mothers who had received custody of the children had lived with them in other States for several years.

The Court of Appeal of Florida has stated that jurisdiction provisions analogous to section 601 have superseded the prior law of "continuing jurisdiction." Under provisions identical to sections 601(a)(1) and (2), Florida courts had no jurisdiction to grant modification at the request of the father after the mother had lived with the children in another State for approximately 1½ years. The court stated that it felt the policy of the Uniform Act was to give only one State jurisdiction, and that exceptional circumstances would be needed to justify relying on the "substantial evidence" basis for jurisdiction if another State satisfied the "home state" test. (*Hegler v. Hegler* (Fla. App. 1980), 383 So. 2d 1134.) In *Detko/Roberts v. Stikelether* (Fla. App. 1979), 370 So. 2d 383, the mother who had received custody moved the child to another State. The father and mother had each appeared at some

point in the other spouse's custody-modification action in the other spouse's State. However, the father took the child to Florida before the final hearing in the mother's proceedings and sought modification of the custody decree to grant him custody. The court of appeal held Florida courts have no jurisdiction of this modification action.

The Court of Special Appeals of Maryland had occasion to consider jurisdiction provisions similar to section 601, stating that "the cases indicating Maryland's adherence to the 'continuing jurisdictional rule' are, to the extent of any inconsistency with the statute, no longer controlling authorities." (*Howard v. Gish* (1977), 36 Md. App. 446, 450, 373 A.2d 1280, 1282-83.) In *Howard* the mother and child lived in Georgia for two years after the Georgia divorce decree, then in Virginia for three years, and finally in Maryland for two years prior to the mother's death. Nevertheless, courts of Maryland, not Georgia, had jurisdiction to determine a custody dispute between the Maryland stepfather on one side and the Georgia father and maternal grandmother on the other.

Under provisions identical to section 3(a)(1) and (2) of the Uniform Act, the Supreme Court of Oregon decided that, after the children had lived in Oregon 18 months with the mother, Oregon courts had, and Indiana courts did not have, jurisdiction of custody-modification proceedings, even though the mother had used temporary custody under an Indiana decree to wrongfully remove the children from Indiana. *In re Marriage of Settle* (1976), 276 Or. 759, 556 P.2d 962.

Counsel for the father quotes a law review hypothetical posed by Professor B. Bodenheimer, reporter for the special committee of the Commissioners on Uniform State Laws which prepared the Uniform Child Custody Jurisdiction Act. That hypothetical situation is primarily based on section 14(a) of the Uniform Act (which has no counterpart in the Illinois act). It states:

"A typical example is the case of the couple who are divorced in State A, their matrimonial home state, and whose children are awarded to the wife, subject to visitation rights of the husband. Wife and child move to state B, with or without permission of the court to remove the children. State A has continuing jurisdiction and the courts in State B may not hear the wife's petition to make her the sole custodian, eliminate visitation rights, or make any other modification of the decree, even though state B has in the meantime become the "home state" under section 3. The jurisdiction of state A continues and is exclusive as long as the husband lives in state A unless he loses contact with the children, for example, by not using his visitation privileges for three years." Bodenheimer, *The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws*, 22 Vand. L. Rev. 1207, 1237 (1969).

Section 14(a) states:

"(a) If a court of another state has made a custody decree, a court of this State shall not modify that decree unless (1) it appears to the court of this State that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this Act or has declined to assume jurisdiction to modify the decree and (2) the court of this State has jurisdiction." (9 Unif. Laws Ann. 153-54 (1979).)

Section 14(a) clearly does not excuse the original court from continuing to meet the jurisdictional standards of section 3. Professor Bodenheimer agrees: "In other words, a person seeking a modification of a custody decree must address his petition to the prior custody court unless that court no longer *has jurisdiction* under the 'home state' or 'strong contacts' test." (Emphasis supplied.) (22 Vand. L. Rev. 1207, 1236.) The California Court of Appeal, after quoting the hypothetical, stated, "All petitions for modification are to be addressed to the state which rendered the original decree if that state *has jurisdiction under the Act* [citation]." (Emphasis added.) (*Palm v. Superior Court* (1979), 97 Cal. App. 3d 466, 468, 158 Cal. Rptr.

786, 792.) As thus interpreted, the Bodenheimer hypothetical is in accord with the Supreme Court of Colorado, which has indicated that Colorado courts will defer to the "continuing jurisdiction" of the original State under Colorado's version of the Uniform Act, so long as the court which rendered the original custody decree, at the time of the modification proceeding, has jurisdiction under criteria of the Uniform Act. *Fry v. Ball* (1975), 190 Colo. 128, 544 P.2d 402. See also *Fernandez v. Rodriguez* (Sup. Ct. 1978), 97 Misc. 2d 353, 411 N.Y.S.2d 134.)

As is apparent from these cases and Professor Bodenheimer's comments, the crucial question is whether the State of the original custody decree still retains "jurisdiction." As the commissioners' note to section 3 of the Uniform Act states:

"The first clause of the paragraph [2] is important: jurisdiction exists only if it is in the *child's* interest, not merely the interest or convenience of the feuding parties, to determine custody in a particular state. The interest of the child is served when the forum has optimum access to relevant evidence about the child and family." 9 Unif. Laws Ann. 123-24 (1979).

In the present case the section 601 standards (identical to those of section 3 of the Uniform Act) required for exercise of the Illinois court's "continuing jurisdiction" are simply not met. We do not interpret Professor Bodenheimer's comments as indicating disagreement, in such circumstances, with the conclusion we reach.

Unless the facts of the present case fit within one or more of the four subsections of section 601(a) of the Act, the circuit court did not have subject matter jurisdiction, as that term is used in the Act, for the purpose of modifying the Siegel custody decree in January 1978. We do not believe the facts before us fit those criteria. The "home state" requirement of section 601(a) is tested in this case as of the winter of 1977-78. At that time Illinois was not the home State of the Siegel children, since they

had by then lived in California for over three years. Although the Act, unlike the Uniform Act, does not expressly define "home state" in terms of six months' residence, Illinois could not be said to have then been the Siegel children's "home state" in any ordinary sense of the words.

Nor do our facts satisfy the requirements of section 601(a)(2). That section is identical to section 3(a)(2) of the Uniform Act, the purpose of which is "to limit jurisdiction rather than to proliferate it." (Commissioners' Note, sec. 3, 9 Unif. Laws Ann. 124 (1979).) It should not be used to excess by courts eager to justify jurisdiction. (See Ratner, *Procedural Due Process and Jurisdiction to Adjudicate*, 75 Nw. U.L. Rev. 363, 392 (1980).) Although that section has been considered in four appellate court cases, none involved facts similar to this case. (*In re Custody of Hawkins* (1979), 77 Ill. App. 3d 873; *In re Custody of Holman* (1979), 77 Ill. App. 3d 732; *In re Custody of Ehr* (1979), 77 Ill. App. 3d 540; *Tanner v. Smith* (1978), 61 Ill. App. 3d 456.) Nothing before us indicates that the interests of the children will be better served if the modification proceedings are heard in Illinois. While the children were born here and lived here until 1974, and while their grandparents and father reside here, those facts indicate only that the children once had a significant connection with Illinois, not that in the winter of 1977-78 a significant connection with Illinois existed. As earlier noted, section 3(a)(2) of the Uniform Act emphasizes availability of evidence as a factor in determining which court shall act. Here, that evidence is largely concentrated in California. Their mother and an aunt and uncle live there, and the children had lived there since 1974, a period which, as of December 1977, covered three highly formative years. The evidence concerning their present home life, health, education and personal relationships was available there, rather than in Illinois.

Section 601(a)(3) is inapplicable, since the children were not abandoned or neglected within Illinois. Section 601(a)(4) cannot apply, because California had jursidiction under the standards of section 601(a)(1) and (2), and it had not refused to exercise that jurisdiction.

California courts appear to give some effect to the concept of "continuing jurisdiction," nothwithstanding provisions similar to section 601 of the Act. (*Palm v. Superior Court* (1979), 97 Cal. App. 3d 395, 158 Cal. Rptr. 786; *Smith v. Superior Court* (1977), 68 Cal. App. 3d 457, 137 Cal. Rptr. 348.) Those cases are distinguishable, however, since here the modification proceedings in California (the new "home state") were begun prior to the Illinois (the forum - "divorce decree" State) proceedings. In *Palm,* modification proceedings in the "divorce-decree" State were deferred to, in part, because they had priority, and in *Smith* no proceedings in the new "home state" were competing with the proceedings in the forum-"divorce decree" State. We believe that California courts, if confronted with a case parallel to the present case, might well reach the result we do, since California courts impose limits on the exercise of "continuing jurisdiction" by means of active application of the doctrine of *forum non conveniens.* (*Bosse v. Superior Court* (1979), 89 Cal. App. 3d 440, 152 Cal. Rptr. 665; *In re Marriage of Kern* (1979), 87 Cal. App. 3d 402, 150 Cal. Rptr. 860; *Schlumpf v. Superior Court* (1978), 79 Cal. App. 3d 892, 145 Cal. Rptr. 190; *Clark v. Superior Court* (1977), 73 Cal. App. 3d 300, 140 Cal. Rptr. 709.) For example, in *Bosse,* the court of appeal held that the California trial court, which had granted the divorce, had abused its discretion in failing to stay the father's May 1978 contempt and custody-modification proceedings on *forum non conveniens* grounds pending the outcome of similar proceedings commenced by the mother in June 1978 in Montana, where she and the child had lived since the

January 1977 divorce. The court noted that Montana was the child's home State, and that evidence of present or future care, protection, training and personal relationships was more readily available there.

Although the doctrine of *forum non conveniens* could conceivably afford a basis for our decision, we believe it preferable to use the statutory grounds, particularly since the Uniform Act has now been adopted here. The language of section 601 of the Act is too explicit to allow any doubt that in the winter of 1977-78 the circuit court should have declined to act on matters relating to the custody of the Siegel children. Illinois, which was once the "home state," had been superseded in that capacity by California. Information concerning the children's mental and physical well-being, their education and training, their personal relationships with friends and some family members, all of which is vital to intelligent custody judgments, is much more readily available to the California courts. True, contesting visitation, support and custody questions in California, rather than Illinois, will be more inconvenient and costly for the father if such contests become necessary. It is, however, an unpleasant fact that, in a highly mobile society with a high incidence of marital instability, problems such as this are not infrequent. Section 601 was designed to provide that custody disputes be resolved in the forum where the facts necessary to a determination of the children's best interests are most readily accessible. Its adoption by our legislature superseded the "continuing jurisdiction" principle wherever that principle conflicts with the statutory provisions. That, in our judgment, is true here.

The law of Illinois in January 1978 viewed California as the appropriate forum for determining child-custody questions, a subject with which the contempt proceedings were inextricably interwoven. In these circumstances, even though the mother was in violation of the circuit

court's order, it was an abuse of that court's discretion to adjudge her in contempt and terminate support payments.

The judgment of the appellate court is accordingly affirmed insofar as it reversed the finding of contempt and the termination of support payments; it is reversed insofar as it affirmed the "continuing jurisdiction" of the circuit court and remanded for a further hearing on the contempt question. The cause is remanded to the circuit court with directions to dismiss the contempt petitions and vacate the orders entered in connection therewith.

*Affirmed in part and reversed in part and remanded, with directions.*

MR. JUSTICE SIMON took no part in the consideration or decision of this case.