673 N.E.2d 386 (1996)
284 Ill. App.3d 1080
220 Ill.Dec. 474
In re ESTATE OF Kirsten JOHNSON, a Minor (Vera Howse, Petitioner-Appellee,
v.
Eric Johnson, Respondent-Appellant).
No. 1-95-4018.
Appellate Court of Illinois, First District, Fifth Division.
November 8, 1996.
*387 Roderick F. Mollison, Chicago, for Respondent-Appellant.
Lester L. Barclay, Chicago, for Petitioner-Appellee.
Justice GORDON delivered the opinion of the court:
Vera Howse filed a petition seeking appointment of herself as the successor guardian of the person of the minor, Kirsten Johnson, her niece, after Kirsten's mother and guardian, Barbara Johnson, died. Kirsten, who was 16 years old, signed the petition and nominated Vera Howse as the guardian of her person. Attached to Howse's petition was a copy of Barbara Johnson's will in which she nominated her sister, Vera Howse, as guardian of Kirsten's person and estate. Eric Johnson, Kirsten's father, moved to dismiss Howse's petition and alternatively sought appointment of himself as Kirsten's successor guardian. After the hearing, the trial court denied Eric Johnson's motion and request to be appointed Kirsten's guardian and granted Howse's petition. The court determined that it was in Kirsten's best interest that Howse be appointed the guardian of her person. Eric Johnson appeals.
The issues raised in this appeal are whether the probate court had jurisdiction to appoint a nonparent as guardian of a minor when a parent is living and able to care for the minor and whether the trial court afforded the surviving, noncustodial parent a fair hearing.
The evidence presented at the hearing on the petitions seeking appointment of guardianship showed that the marriage of Barbara and Eric Johnson was dissolved pursuant to judgment entered on September 26, 1983. That judgment awarded sole custody of Kirsten Johnson to Barbara and provided visitation rights to Eric. Eric was required to pay $500 per month in child support and was responsible for Kirsten's extraordinary medical expenses.
On May 28, 1986, Kirsten sustained multiple trauma with severe head injuries.[1] A personal injury lawsuit was filed on her behalf and that lawsuit was settled in 1990. In *388 accordance with the settlement agreement, Kirsten received a cash payment of $750,000 plus a structured settlement annuity that guaranteed total payments of $4,485,405.88 with expected total payments reaching as high as $14,418,036.24. First Colonial Trust Company was named by the probate court to act as the guardian of Kirsten's estate. Barbara Johnson, the custodial parent, remained as the guardian of Kirsten's person until her death on April 30, 1995.
Vera Howse, Barbara Johnson's sister, testified that in 1993, for a period of about three weeks while Barbara was in the hospital undergoing a bone marrow transplant, she was appointed by the court to care for Kirsten. After Barbara was released from the hospital, Howse continued to assist Barbara and cared for Kirsten by bringing food and making sure that Kirsten attended school and doctor appointments. In June 1994, when Barbara could no longer care for herself or Kirsten, Barbara and Kirsten moved into Howse's home in Matteson, Illinois. Howse made arrangements for Kirsten to have necessary dental work performed and for her to attend counselling at school. She also talked to Kirsten's teachers on several occasions. Howse regularly took Kirsten to her church in Chicago even though Howse attended another church.
Howse stated that, after Barbara's divorce and until June 1994, Eric Johnson was not involved in the day-to-day responsibilities toward Kirsten. She stated that she also never saw him during the three-week period in 1993 when Barbara was hospitalized. Howse had no knowledge whether Eric called the house to see how Kirsten was doing or whether Kirsten had any contact with Eric during that three-week period. She stated that the first time Eric came to see Kirsten after her move to Matteson was in October 1994. According to Howse, Eric visited Kirsten once in February 1995 and a couple of times in March. Howse did not think that Eric took Kirsten over to his house on any of those occasions and stated that Kirsten never stayed overnight at Eric's house.
Howse further testified that while Barbara was alive and living with her, she would receive about $500 per month from Barbara. She stated that she did not know whether Barbara was receiving any child support payments from Eric.
Howse stated that she wanted to be Kirsten's guardian because Kirsten was "like [her] daughter" and because she helped Barbara raise Kirsten since Kirsten was born. She stated that she raised Kirsten in "a Christian atmosphere" and with love.
On cross-examination by Kirsten's guardian ad litem, Howse stated that Eric visited Kirsten a few times in April 1995 before Barbara died. At that time, Eric did not offer to provide any money or to take custody of Kirsten. She stated that in May 1995 Kirsten stayed overnight at Eric's house. Kirsten also stayed overnight a couple of times in June. On none of those occasions did Eric offer to provide any money to Howse. Howse stated that Eric visited Kirsten in July 1995 and once in August. He took Kirsten for about a week and a half in September without Howse's consent. Howse further stated that from the time of Barbara's death until the hearing, Eric had never provided her with any financial support for Kirsten and had never discussed Kirsten's daily needs, education, or religious instruction with her.
On cross-examination by Eric's counsel, Howse testified that she never approached Eric to discuss Kirsten's daily needs, educational needs, religious education or support. Howse admitted that she did not have personal knowledge regarding any child support payments made by Eric to Barbara. She stated that the sole basis for her testimony regarding Eric's support payments was a conversation she had with Barbara "about a year ago" in which Barbara told her that Eric hadn't paid support in about four or five years.
Howse stated that in March 1995 she had a discussion with Eric concerning Kirsten's living arrangements if Barbara was to die. She stated that Eric indicated that he wanted Kirsten. When Barbara died, Eric told Howse that he had talked to Kirsten and that Kirsten stated she wanted to stay with Howse. Howse testified that Eric said that Kirsten could stay with her until she finished *389 high school. She conceded that Eric was a member of Kirsten's church and that Eric attended that church while he was married to Barbara and also attended that church on a few occasions after Barbara died.
Howse further testified that her home in Matteson was sold in February 1995 to the trust fund established for Kirsten's estate.[2] After the sale, Howse continued to reside in the home with her mother, Esther J. Miles, who was deceased at the time of the hearing; her son and daughter; her sister, Esther Frierson; and her brother, Elmer Miles, who had "MS." Howse stated that Esther Frierson moved in to help with Kirsten. The Matteson house has three bedrooms, one of which is occupied by Kirsten. Kirsten shared the room with her mother and also shared it with overnight guests. Howse admitted that neither she nor any members of her family were making rent payments to Kirsten. She stated, however, that the bills for the house were still in her name (although there was nothing in the record to establish who paid those bills); that her sister, Esther, who was unemployed, gave her $100 per month; and that all of the people who lived in the Matteson home paid for food, washed clothes and kept the house clean.
Mary Hawes, a speech language pathologist for the Rich Township high schools and a teacher in the special education program, testified that Kirsten was one of eleven students assigned to her care. Kirsten came to the school in the fall of 1994. She tested Kirsten in early 1995 and determined that Kirsten was at the 11th grade level in reading recognition, which she defined as Kirsten's "ability to say words, not the understanding;" better than twelfth grade in spelling (twelfth grade nine months); fourth grade in mathematics; and third grade in reading comprehension. She stated that Kirsten was "mainstreamed out for chorus and PE." Hawes disclosed that she met with Barbara on two occasions and that she had several telephone conversations with Howse concerning Barbara's illness. Hawes saw Howse and Frierson when they attended an awards ceremony at school, when they attended an open house, and spoke with them by telephone on several occasions. She also spoke with Eric Johnson once at the end of the prior school year.
On cross-examination, Hawes testified that Eric Johnson spoke with her in the fall of 1995 about placing Kirsten in another school district. She also met with him and had another telephone conversation with him concerning Kirsten's move to Bolingbrook. She did not know whether a program at another school would be as good or better than the program at Rich Central if Kirsten transferred to another school. Hawes stated that Kirsten was a junior and was scheduled to graduate the following school year.
Esther Frierson, the sister of Vera Howse, testified that she had taken care of some of the responsibilities and duties surrounding the day-to-day life of Kirsten since Kirsten was born. During the four or five months preceding Barbara's death, Frierson would visit the Matteson house on a daily basis to help Barbara and Kirsten. When Barbara died, she moved into the Matteson house to help with Kirsten while Vera was at work. She stated that she would wake Kirsten up in the morning, make sure her clothes were ironed, make sure she had eaten breakfast and had taken care of her personal hygiene and sent her off to school. When Kirsten returned from school, Frierson would help her with her homework. Frierson testified that since May 1995, Eric came to the house four times. She further testified that Kirsten is living in a stable environment, has friends, goes to church, is comfortable and "feels free to grow."
Katherine Miles, Kirsten's cousin, testified that she lived with Barbara during the period of 1984 until Barbara moved to Matteson. She stated that she helped care for Barbara's children while Barbara was at work. She stated that, when she lived with Barbara, she *390 observed Barbara crying on several occasions because she was not receiving child support monies. With respect to Eric's visits with his children, Miles testified that "sometimes [Eric] would show up and sometimes he wouldn't." According to Miles, there were times that Eric did not meet the needs of his family.
On cross-examination, Miles testified that she did not know how much money Eric was ordered to pay Barbara. She also stated that she did not know how much he did pay.
Robert Jansen, vice president of Firstar Bank of Illinois, formerly known as First Colonial Trust Company, the bank acting as the guardian of Kirsten's estate, testified that payments were being made out of Kirsten's estate for mortgage loans, homeowner's insurance, and health insurance. He stated that Kirsten's estate had paid approximately $23,000 in health insurance premiums and that Eric Johnson had reimbursed the estate in the approximate amount of $6,500. On cross-examination, Jansen stated that in August 1995 Eric had advised him that he had an insurance policy for Kirsten. Eric did not provide any identification for that insurance.
Steffa Mirel, a psychotherapist licensed in the state of Illinois as a clinical social worker, was called by Eric Johnson. Mirel testified that she was Kirsten's therapist from July 1991 until November 1994. She stated that she had occasion to talk to Eric during the one-year period beginning late 1991 or early 1992 when he would bring Kirsten for her appointments. She also testified that she had one occasion to talk to Kirsten thereafter, on September 20, 1995, pursuant to a telephone request from Eric. Because of the confidentiality privilege, Mirel was not allowed to testify concerning the nature and content of any of her conversations with Kirsten.
Eric Johnson testified that since January 1993 he has lived in a house in Bolingbrook with his current wife, her mother, her sister and her niece. He is an architect and has worked in that business for thirty years. His current employment began in April 1995. Eric's wife and sister-in-law work full time, and his mother-in-law remains at home. There are four bedrooms in the home, one of which is for Kirsten. Eric made a partial contribution toward the down payment on the house but his wife is solely obligated on the mortgage and note. Eric's income is used, however, to pay the mortgage and other expenses. He does not receive any financial contributions from his current wife's family other than to buy food on occasion.
Eric testified that currently he is only able to see Kirsten if Vera Howse or Esther Frierson "allow" him to see her. He defined "allow" by saying "[t]hat means that she would not be home, or they would not open the door, or they would not answer the phone, or they would not let me see her." He stated that he was told by Howse that he could see Kirsten on two or three occasions although he wanted to see Kirsten every Saturday. He stated that he attempted to see Kirsten at church but that Kirsten was hidden from him. Eric estimated that since Barbara died his attempts to visit Kirsten were thwarted by Howse or Frierson on about 25 occasions. He denied that he told Howse that she could keep Kirsten.
Eric also testified to a recent occurrence wherein Kirsten lived with him and his wife for a nine-day period. He stated that during that time he took her to church and to Rich Central School. He attempted to enroll Kirsten at Bolingbrook High School which had a program similar to the one she had been enrolled in at Rich Central.
Eric further testified that he is willing and able to participate in the day-to-day care decisions involving Kirsten. He testified that he had cared for Kirsten on a full-time basis during the period of December 1984 until June 1985 while Barbara was hospitalized. During that time period, he took Kirsten to school and picked her up, fed her, washed her and cared for her. Eric stated that he was prepared to act as Kirsten's father and guardian and to support and care for her.
On cross-examination, Eric stated that during his last visitation with Kirsten, Kirsten asked to stay with him. He stated that Kirsten had made that request before but that when he would approach Howse he was told to talk to Howse's attorney. Eric admitted *391 that he recently wrote two letters to Rich Central High School advising the school that Barbara had died and that Kirsten could not be picked up from that school by anyone other than Eric, his wife or his mother-in-law. He stated that he wrote the letters after calling the school and being told that Kirsten's records did not reflect Barbara's death.
Eric admitted that during the nine-day period that he kept Kirsten he was cognizant of ongoing court proceedings to determine who would be Kirsten's guardian. He denied having knowledge that the court proceedings also dealt with the issue of Kirsten's custody. He admitted that he returned Kirsten to Howse the day after a court order was issued directing him to do so. He also stipulated that he disobeyed several court orders with respect to the payment of Kirsten's health insurance premiums and that he was found in contempt for failure to comply with those court orders. He stated that he made partial premium payments in 1991, 1992 and 1993 because he had lost his job and was trying to start his own business during those years. He also said that the 1994 and 1995 premiums did not warrant payment because he had other insurance coverage for Kirsten. He admitted that he never petitioned the court to relieve himself of the insurance premium obligations because of that alternate coverage.
With respect to child support payments, Eric admitted that he did not make any payments when he was unemployed. He stated that when he was working he made all payments to Barbara until her death. Although he earned an income of $70,000 from May 1994 to May 1995, he produced four cancelled checks made payable to Barbara during that time period totalling $1,050. He stated that he had written receipts for cash payments he had made to Barbara but that they were at his home. Eric admitted that after Barbara died he made no support payments to Howse. He stated that she did not ask for financial support and that he did not offer any but that he offered to take Kirsten and pay for all her needs.
Eric further testified that he contacted Kirsten's school in May 1994 to request that he be sent notice of any school functions involving Kirsten. He was told that the school could not include him as a person to be notified of events because the computer at the school allowed for the listing of only one address and that address was Barbara's.
The record reflects that Kirsten wrote a note to the trial judge in which she expressed a preference to live with her father. When questioned about that note by the trial judge in chambers, Kirsten stated that her father told her to write the note. She also stated that she wrote it because she did not know what to do and in order to "cooperate." When asked where she preferred to live, Kirsten stated that she preferred to live with her aunt. She stated that she received love and affection from her aunt and that when she was with her father she received "negative feedback." Kirsten said she was not comfortable at her father's house because she felt that she was "concealed" in one room and because the house was so big and she had to go up steps which she hated to do.
In its order granting Vera Howse's petition for appointment of guardianship, the court noted that it had examined the entire court file on Kirsten Johnson, all of the testimony presented at the hearing and all of the exhibits entered into evidence. The court noted that Eric Johnson had rendered insignificant assistance for the last five years and had made payments to Kirsten's estate for her health insurance premiums only pursuant to the court's issuance of "rules to show cause" and writs of attachment. The court also noted that Eric had not reimbursed Kirsten's estate since 1993 even though he earned $70,000 in the 1994-1995 year. The court stated that the evidence was clear that Howse was capable of meeting Kirsten's special needs and gave considerable weight to Kirsten's preference for her aunt. The trial court concluded that it was in Kirsten's best interest that Vera Howse be appointed the guardian of her person and be entitled to her custody.
On appeal, Eric first contends that the probate court did not have subject matter jurisdiction to appoint Howse, a nonparent, as guardian of Kirsten's person when he, Kirsten's parent, was alive and willing to *392 care for her. In support of this argument, Eric relies upon section 11-5(b) of the Probate Act of 1975 (the Probate Act) which states in pertinent part:
"The court lacks jurisdiction to proceed on a petition for the appointment of a guardian of a minor if (1) the minor has a living parent, adoptive parent or adjudicated parent, whose parental rights have not been terminated, whose whereabouts are known, and who is willing and able to make and carry out day-to-day child care decisions concerning the minor * * *. There shall be a rebuttable presumption that a parent of a minor is willing and able to make and carry out day-to-day child care decisions concerning the minor, but the presumption may be rebutted by a preponderance of the evidence." 755 ILCS 5/11-5(b) (West 1994).
Eric argues that no evidence was presented at the hearing to rebut the presumption that he was willing and able to make and carry out the day-to-day child care decisions concerning Kirsten and, thus, in accordance with section 11-5(b) of the Probate Act, the court lacked jurisdiction to proceed on Howse's petition for guardianship and erred in proceeding to make a best interest of the child determination with respect to Kirsten's custody.
Preliminarily, Howse contends that the essence of Eric's argument is standing and that Eric is precluded from making any standing contention because he did not raise standing as an affirmative defense in his motion to dismiss. See In re Marriage of Schlam, 271 Ill.App.3d 788, 207 Ill.Dec. 889, 648 N.E.2d 345 (1995) (standing is an affirmative defense that is waived if not raised within the time of pleading (735 ILCS 5/2-619(a) (West 1994)). We disagree.
While Eric's motion below and his argument on appeal raise the issue of subject matter jurisdiction, his contentions have consistently been predicated on section 11-5 of the Probate Act and, as such, implicitly raise standing. "Jurisdiction," as it is used in section 11-5(b) of the Probate Act does not refer to "jurisdiction" in the traditional subject matter sense. Subject matter jurisdiction is constitutionally conferred upon the circuit court. Schlam, 271 Ill.App.3d 788, 207 Ill.Dec. 889, 648 N.E.2d 345. The purpose of section 11-5(b) is to prevent the circuit court from exercising its subject matter jurisdiction when the petitioner lacks standing. Such a conclusion was reached in cases construing the "jurisdictional" requirements for custody proceedings filed under the Illinois Marriage and Dissolution of Marriage Act (the Dissolution Act) (750 ILCS 5/101 et seq. (West 1994)). See Siegel v. Siegel, 84 Ill.2d 212, 221, 49 Ill.Dec. 298, 302, 417 N.E.2d 1312, 1316 (1981) (stating that the General Assembly did not use the term "jurisdiction" in section 601 of the Dissolution Act in the traditional sense of subject matter jurisdiction but rather "in the sense of a limitation upon the exercise of the existing jurisdiction"); Schlam, 271 Ill.App.3d 788, 207 Ill.Dec. 889, 648 N.E.2d 345. That term and the provision within which it appears was said to have created a standing requirement. See In re Custody of Peterson, 112 Ill.2d, 48, 52, 96 Ill.Dec. 690, 692, 491 N.E.2d 1150, 1152 (1986) (the standing requirement for nonparents appears in section 601 of the Dissolution Act); Schlam, 271 Ill.App.3d at 795, 207 Ill.Dec. 894, 648 N.E.2d at 350 ("`jurisdiction' as the term is used in section 601 of the [Dissolution] Act, refers to a standing requirement for persons petitioning for child custody"). Thus, since Eric's motion to dismiss argued lack of jurisdiction under section 11-5(b) of the Probate Act, and since "jurisdiction" as it is used in that provision refers to the standing requirement (see Schlam, 271 Ill.App.3d 788, 207 Ill.Dec. 889, 648 N.E.2d 345), that motion preserved the issue of standing for review.
Before a nonparent can petition for custody and demand a custody hearing to determine the best interests of the child, the nonparent must show that he has standing. E.g., In re Kirchner, 164 Ill.2d 468, 208 Ill. Dec. 268, 649 N.E.2d 324 (1995); In re Marriage of Thompson, 272 Ill.App.3d 257, 209 Ill.Dec. 294, 651 N.E.2d 222 (1995) (unless standing is established, court cannot proceed to determine which locus of custody would serve the best interests of the child); Schlam, 271 Ill.App.3d 788, 207 Ill.Dec. 889, 648 N.E.2d 345; In re Marriage of Haslett, *393 257 Ill.App.3d 999, 195 Ill.Dec. 874, 629 N.E.2d 182 (1994). The standing requirement is an acknowledgment of the superior rights doctrine. Kirchner, 164 Ill.2d 468, 208 Ill.Dec. 268, 649 N.E.2d 324; Peterson, 112 Ill.2d 48, 96 Ill.Dec. 690, 491 N.E.2d 1150. See In re Estate of Barnhart, 232 Ill.App.3d 317, 174 Ill.Dec. 26, 597 N.E.2d 1238 (1992) (superior rights doctrine has been incorporated into the Probate Act). That doctrine provides that "`[i]n child-custody disputes it is an accepted presumption that the right or interest of a natural parent in the care, custody and control of a child is superior to the claim of a third person.'" Peterson, 112 Ill.2d at 51, 96 Ill.Dec. at 691, 491 N.E.2d at 1151 quoting In re Custody of Townsend, 86 Ill.2d 502, 508, 56 Ill.Dec. 685, 688, 427 N.E.2d 1231, 1234 (1981).
Here, whether Howse has standing to petition for guardianship and custody of Kirsten depends upon whether she has rebutted the presumption that Eric was willing and able to make and carry out day-to-day child care decisions concerning Kirsten. 755 ILCS 5/11-5(b) (West 1994). See Thompson, 272 Ill.App.3d 257, 209 Ill.Dec. 294, 651 N.E.2d 222 (rebuttable presumption in favor of parent under section 601(b)(2) of the Dissolution Act); Barnhart, 232 Ill.App.3d 317, 174 Ill.Dec. 26, 597 N.E.2d 1238 (presumption in favor of parent in Probate Act). Whether a nonparent petitioner may have the ability to provide a better environment for the child is not a factor to be considered where standing is in issue so long as the presumption that the natural parent is willing and able to care for the child remains unrebutted. To compare the potential of the nonparent against the parent when making a standing determination would jeopardize the custodial rights of natural parents such that any nonparent with better qualifications, albeit a stranger, could be found to have standing to petition for custody notwithstanding the established threshold adequacy of the natural parent.
Nor can the child circumvent the superior rights doctrine as embodied in the standing requirement of the Probate Act by nominating a nonparent guardian. See Barnhart, 232 Ill.App.3d 317, 174 Ill.Dec. 26, 597 N.E.2d 1238. This court is cognizant of the fact that Kirsten signed Howse's petition and nominated Howse as her guardian pursuant to section 11-5(c) of the Probate Act. 735 ILCS 5/11-5(c) (West 1994). That provision, which permits a minor who is 14 years of age or older to nominate a guardian, allows the court to consider the minor's preference where the preference is expressed in favor of a person with standing. Barnhart, 232 Ill.App.3d at 322, 174 Ill.Dec. at 29-30, 597 N.E.2d at 1241-42 (nomination of grandparents by granddaughter pursuant to section 11-5(c) of the Probate Act does not confer standing upon grandparents).[3]
Based upon the record before us, we do not believe that Howse has met the burden of overcoming the presumption that Eric was willing and able to make and carry out day-to-day care decisions concerning Kirsten. See Thompson, 272 Ill.App.3d 257, 209 Ill. Dec. 294, 651 N.E.2d 222 (standing under 601(b)(2) of the Dissolution Act); In re Person & Estate of Newsome, 173 Ill.App.3d 376, 123 Ill.Dec. 61, 527 N.E.2d 524 (1988) (standing under 11-5 of the Probate Act). Although there was testimony at the hearing that Eric failed to meet his monetary obligations with respect to the payment of Kirsten's health insurance premiums, he testified that his inability to do so was caused by his lack of income and failed business venture. There also was evidence suggesting that Eric had failed to meet his child support *394 obligations but that evidence was not conclusive and was refuted by Eric. Notwithstanding any evidence in this regard, it should be noted that Eric's financial shortcomings largely occurred after the multi-million dollar settlement of Kirsten's personal injury action. To that extent, Kirsten's needs and health insurance coverage were not jeopardized since her estate had the financial resources to pay for Kirsten's necessities and health insurance. Finally, while there was some evidence to suggest that Eric's visitation with Kirsten was sparse, there also was evidence to suggest that several of Eric's attempts to visit with Kirsten had been thwarted by her aunts.
There also was unrefuted evidence that at the time of the hearing, Eric remarried, returned to full-time employment, and lived in a home wherein his mother-in-law could care for Kirsten while Eric and his current wife were at work. Eric testified that he attended the same church in Chicago that Kirsten attended. Eric further testified to his attempts to obtain Kirsten's custody shortly after Kirsten's mother died and to the numerous occasions, approximately 25, upon which his attempts to visit with Kirsten were thwarted. Eric testified concerning his attempts to locate an educational program that would be meet Kirsten's needs at the high school near his home. He also testified to his discussions with Mary Hawes, which she corroborated, about Kirsten's placement in another school and about his unsuccessful attempt to obtain notification from Rich Central High School of that school's activities. The testimony also showed that Eric had cared for Kirsten on a full-time basis for two extended periods. No evidence was presented to dispute those facts or to suggest that the care Eric provided to Kirsten on those occasions was inadequate. Finally, there was unrebutted evidence that for a period of one year, Eric brought Kirsten to her psychotherapy sessions. When viewed in its entirety, the evidence presented did not rebut the presumption that, at the time of the hearing, Eric was willing and able to make and carry out the day-to-day child care decisions concerning Kirsten.
In view of our determination that this matter warrants reversal because Howse lacked standing, we need not consider Eric's second argument in favor of reversal predicated upon the allegation that he was denied a fair hearing.
For the foregoing reasons, the judgment of the Circuit Court of Cook County is reversed and the cause is remanded for further proceedings.
Reversed and remanded.
McNULTY, P.J. and HOURIHANE, J., concur.
NOTES
[1] As a result of Kirsten's traumatic brain injury, she is learning disabled and speech and language disabled.
[2] Documents in the record show that in September 1994 a mortgage foreclosure was anticipated on Vera Howse's Matteson home. A petition filed by the guardian of Kirsten's estate and at the request of Kirsten's mother, sought authority to purchase the home for an amount equal to the outstanding indebtedness (first and second mortgages and 1994 real estate taxes). The purchase at an amount not to exceed $108,000 was approved by court order on February 9, 1995.
[3] A minor is not without legal recourse, however, to seek early emancipation from his or her parents where the minor is at least 16 years of age. Under the Emancipation of Mature Minors Act (750 ILCS 30/1 et seq. (West 1994)), a "mature minor" who has demonstrated the ability and capacity to manage his or her own affairs and live wholly or partially independent of his or her parents, may petition the court to obtain the legal status of an emancipated person. 750 ILCS 30/7 (West 1994). If the court finds that the minor has demonstrated those abilities and that the minor's emancipation is in the best interests of the minor and his or her family, the court shall enter a finding that the minor is emancipated, or partially emancipated with such limitations as the court deems appropriate. 750 ILCS 30/9 (West 1994). No such petition has been filed in the instant case nor would such a petition seem to be appropriate under the circumstances of this case.