*In re* ESTATE OF KIRSTEN JOHNSON, a Disabled Person (Vera Howse, Petitioner-Appellee, v. Eric Johnson, Counterpetitioner-Appellant).

First District (2nd Division)   No. 1—97—4457

Opinion filed March 2, 1999.

Roderick F. Mollison, of Chicago, for appellant.

Lester L. Barclay, Crystal L. Roberts, and Patrick D. John, all of Barclay & Dixon, P.C., of Chicago, for appellee.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Eric Johnson, the father of Kirsten Johnson, appeals from the trial court's appointment of Vera Howse, Kirsten's maternal aunt, as the guardian of Kirsten's person upon the court's finding that Kirsten was a disabled person.[1] Eric argues that the trial court abused its discretion in making that appointment by failing to give preference to him, Kirsten's surviving parent, and by ignoring evidence of Howse's financial conflict of interest. For the reasons discussed below, we affirm the order of appointment.

## I. BACKGROUND FACTS

This case is a continuation of an earlier proceeding in which Vera Howse petitioned the court to be appointed Kirsten's guardian, upon the death of Kirsten's mother, Barbara, in April 1995, while Kirsten was a minor. (Barbara and Eric divorced in 1983.) This court, in an opinion filed on November 8, 1996, reversed the trial court's appointment of Howse as guardian of Kirsten's person, finding that Howse lacked standing to bring the petition because she failed to present evidence to rebut the presumption that Eric, a natural parent, was willing and able to make and carry out day-to-day child care decisions concerning Kirsten. *In re Estate of Johnson*, 284 Ill. App. 3d 1080, 673 N.E.2d 386 (1996). The matter was remanded to the trial court for further proceedings. It does not appear from the record, however, that Eric was appointed Kirsten's guardian of the person. Instead, on November 10, 1996, two days after the filing of this court's opinion, and in anticipation of Kirsten's eighteenth birthday on December 12, 1996, Howse filed a petition seeking an order declaring Kirsten a disabled person and appointing her (Vera) as the guardian of Kirsten's person. Eric filed a counterpetition seeking his appointment as Kirsten's guardian.[2]

There is no dispute that Kirsten is a disabled person. On May 28,

---

[1] The court also appointed Suburban Bank & Trust Company, successor to First Colonial Trust Company, guardian of Kirsten Johnson's estate. There is no contention of error with respect to this appointment.

[2] The case of *In re Estate of Johnson*, 284 Ill. App. 3d 1080, 673 N.E.2d 386 (1996), dealt with the appointment of a successor guardian of the person of the minor under article XI of the Probate Act of 1975 (755 ILCS 5/11—1 *et seq.* (West 1994)). The instant action concerns the appointment of a guardian of a disabled person under article XIa of the Probate Act of 1975 (755 ILCS 5/11a—1 *et seq.* (West 1996)). The statutory requirements for appointment of a guardian of a disabled person, which shall be discussed in greater detail below, are distinct and independent of the statutory requirements for appoint-

1986, she sustained multiple trauma and severe head injuries as a result of an automobile accident. As noted in our earlier opinion, a personal injury lawsuit filed on Kirsten's behalf was settled in 1990. In accordance with the settlement agreement, Kirsten received a cash payment of $750,000 plus a structured settlement annuity that guaranteed total payments of $4,485,405.88 with expected total payments reaching as high as $14,418,036.24. *Johnson*, 284 Ill. App. 3d at 1082-83, 673 N.E.2d at 387-88.

While the instant action was pending in the circuit court, Kirsten's guardian *ad litem* filed a report concerning her visit with Kirsten on January 25, 1997. According to the report, Kirsten was aware of the competing petitions filed by her aunt and her father seeking appointment as her guardian. Kirsten described her friends, her attendance at high school, and her part-time job at a local food store (which was later phased out by the store). Kirsten reported that she and her mother began living with her Aunt Vera in Matteson after her mother became very ill. She indicated that she enjoyed living with her two aunts, Vera and Esther, her cousin (Vera's son), and her uncle who had multiple sclerosis.[3] Kirsten stated that she felt isolated when she stayed with her father and his wife at their home in Bolingbrook. She did not want to transfer to the high school in Bolingbrook. She stated that she loved her father and wanted to spend more time with him but did not want to move in with him. Kirsten expressed her preference that her Aunt Vera act as the guardian of her person, stating that her aunt knew her and had been there for her, including at the time of her mother's death. Kirsten told the guardian *ad litem* that she would not object to the appointment of her father as the guardian of her person provided she could continue to live with her aunt.

Doctor Daniel J. Luchins, M.D., a board-certified psychiatrist, also filed a report with the court. That report detailed Doctor Luchins' examination of Kirsten. Luchins stated that Kirsten had learning and emotional deficits and had difficulty understanding those deficits. In Luchins' opinion, Kirsten was totally unable to make financial and personal decisions and needed to live with a responsible adult who could supervise her.

At the hearing held to decide the issue of the appointment of Kirsten's guardian, Vera and Eric presented much of the same evidence that was elicited during the proceedings held to appoint Kirsten's guardian during her minority. Kirsten testified that she cur-

---

ment of a guardian of a minor, and, therefore, the disposition of the earlier case does not control the disposition of the instant case.

[3]At the time of the hearing, the uncle was living in a nursing home.

rently lived with her aunts, Vera and Esther. She stated that she graduated from high school (attending a special needs program) and was taking one class, two days a week, at the local college. She stated that when at home, she sleeps, takes a daily shower, and listens to the radio and to gospel tapes. She stated that she would like to be with more people on a daily basis but opined that it was hard to "find people that you could trust." Kirsten estimated that in the two months preceding the hearing, she had seen her father twice. She stated that she telephones her father and he telephones her, but not often. She appreciates his calls because it shows he wants to be involved in her life. Kirsten stated that she had not been to her father's home for a long time. She stated that the Matteson home and her father's home in Bolingbrook were both fine but she preferred to live with her aunts in Matteson.

During examination by Vera's counsel, Kirsten stated that she was extremely close to Vera, who was like a mother to her. She stated that she enjoyed living with Vera and Esther because "there's love, and love is what a family really means to somebody." She also stated that she felt a sense of freedom living with Vera and Esther and that she felt "trapped" at her father's home. Kirsten testified that she enjoyed going to church with Vera and Esther and she wanted to attend the youth group meetings on Friday nights.

During examination by Eric's counsel, Kirsten stated that Vera talked to her a number of times about the court proceedings and told her what her father was trying to do. Kirsten also recalled making a telephone call to her father's attorney at a number given her by Vera. She left a message to the effect that having dinner with her father would not be a good idea. On redirect and recross-examination, respectively, Kirsten stated that her guardian *ad litem* discussed the case with her and that her father also discussed the case with her.

Vera Howse testified that she was employed at a law firm and was away from home from 6:30 a.m. to 7 p.m. She stated that Kirsten was like a daughter to her and came to live with her shortly before Kirsten's mother, Barbara, died. She stated that when Kirsten first came to live with her, while Barbara was alive, Eric was not involved in caring for Kirsten. Vera stated that she and her sister, Esther, attend to Kirsten's daily needs; they help her get ready for school and help her with her homework. Vera taught Kirsten about personal hygiene and attends to Kirsten's health care needs, including the taking of medication and the making of periodic visits to the doctor. Vera testified that, while she is away at work, Esther, who is an in-home care provider, comes home on lunch break to check on Kirsten. Vera also calls Kirsten during the day to check on her. According to Vera,

when Kirsten is not at school, she writes, watches television, works on her computer, and calls people on the telephone. Kirsten also attends two churches with her aunts. She loves to sing, is a member of the church choir, and has participated in concerts. Vera indicated that a vocational evaluation performed on Kirsten recommended that Kirsten obtain employment rather than attend school. Vera stated that Kirsten nevertheless wanted to attend school so she personally paid the $346 for a "Reading Fundamentals" class Kirsten was taking, not for degree purposes but to keep Kirsten's mind "activated." Vera also stated that she has never discussed Kirsten's career aspirations with Eric because he and she have had problems communicating.

Vera testified that she formerly owned the house in which she, Kirsten, Esther, and Vera's son (who is away at college) reside. She stated that at Barbara's suggestion, shortly before her death, Kirsten's trust fund bought the Matteson house, which had been for sale as a result of Vera's divorce. The sale was approved by the court. Howse did not receive any "windfall" from the sale. The utility bills relating to the house remained in Vera's name after the sale because Kirsten was a minor at the time. Vera also testified that she received $500 per month until August 1997 from Kirsten's estate for expenses related to Kirsten's care. She used that money to pay for cable, gas, electric, a car lease, clothing, and to give Esther "a little something for helping" (estimated to be about $20).

Vera denied coaching Kirsten to say certain things. She denied telling Kirsten not to call and not to visit her father. She stated that, on one occasion, after Kirsten turned 18, Kirsten called the police, insisting that she did not want to visit her father's home. Vera also stated that she provided Kirsten with the telephone number of Eric's attorney and told Kirsten that she could do whatever she wanted with respect to visitation. Kirsten has not had overnight visitation with her father since October 1996. The foregoing notwithstanding, Vera stated that Kirsten loves her father.

On examination by Eric's attorney, Vera stated that Kirsten was taken by her father to live with him on September 15, 1996. Howse obtained a court order for Kirsten's return. Kirsten also visited her father every other weekend in 1995 and until October 1996. According to Vera, Eric visited Kirsten two times in 1997.

Vera also testified on cross-examination that she did not pay rent to Kirsten's estate and that she collected about $150 per month in rent from Esther and had collected $50 per month in rent from her brother, who lived in the Matteson house from 1994 until shortly before the hearing. She did not remit any of those funds to Kirsten's estate. Vera stated that she recently obtained a $17,800 estimate for

remodeling the Matteson house. The estimate was signed by Kirsten, because she owned the house, and Vera. Vera intended to pay for the remodeling using her salary. She also testified that during the previous year she personally paid $3,900 for a new roof and $4,000 for resurfacing of the kitchen cabinets.

Vera stated that she did not talk to Eric about where to send Kirsten to school or about enrolling Kirsten in a work program. When asked whether Eric should be able to give input into how Kirsten is raised, Vera first answered in the negative. Later, during questioning by the guardian *ad litem*, Vera stated that she was willing to work cooperatively with Eric concerning decisions to be made as to Kirsten's career choices, medical care and health choices. She stated that if appointed Kirsten's guardian, she would keep Eric apprised of Kirsten's plans, medical procedures and things of that nature. During redirect by her counsel, Vera stated that she would not interfere with reasonable visitation by Eric.

Esther Frierson, Kirsten's other aunt, testified that she had lived in the Matteson home for over two years and during that time she helped Kirsten prepare breakfast, dress, complete homework and get ready for school. She and Vera also cleaned the house. She stated that she would continue to provide assistance to Kirsten if the court appointed Vera as Kirsten's guardian. She stated that she loved Kirsten and denied conspiring to thwart Eric's visits with Kirsten.

On examination by Eric's counsel, Esther stated she knew Eric and saw no reason why he could not do the things for Kirsten that she was doing. She stated that no one consults Eric about Kirsten because he is never civil and because he never calls Vera to find out how Kirsten is doing.

Brandon Johnson, Kirsten's older brother, testified that Vera stopped him from seeing Kirsten on one occasion. He was able to visit Kirsten at the Matteson house on several other occasions. Brandon testified that he observed Kirsten and her father together and found that his father was kind to her and treated her with respect. He also observed Kirsten and Vera together and, in his opinion, Vera did not necessarily provide respect, love and "an appropriate environment." He believed that the Matteson home was not an appropriate home for Kirsten but that his father's home was.

Eric Johnson, Sr., Kirsten's father, testified that he lived in Bolingbrook with his current wife, sister-in-law, niece and mother-in-law. Kirsten lived with them for nine days in 1996 but was returned to Howse pursuant to a court order. Eric is an architect and owns his own company. He stated that his wife is a full-time registered nurse and that his mother-in-law is a retired teacher who could look after Kirsten during the day.

Eric testified that he visited his children regularly after his divorce from Barbara in 1983. He stated that, prior to Barbara's death, he visited his children in Matteson about three times. He stated that the day after Barbara died he was told by Vera and Esther that he could not take Kirsten. He did not see Kirsten until he obtained a court order in November 1995. He saw Kirsten every two weeks from November 1995 to August 1996 and saw her three times in 1997. He also stated that during telephone conversations with Kirsten, he could hear voices in the background. He stated that Kirsten would repeat everything he said to her and on one occasion he could hear her being told to tell him "none of your business." He stated that he did not visit Kirsten more frequently in 1997 because she would agree to see him but then make plans to do something else.

On examination by Vera's counsel, Eric was asked regarding his making of child support payments. He testified that he made all support payments. He admitted that there was a time when he did not make those payments but that the deficiency had been corrected. He presented no documentary evidence to support that testimony.

On examination by the guardian *ad litem*, Eric testified that he investigated a program in Palos Heights for children like Kirsten who need special training. He also stated that, if he were appointed Kirsten's guardian, he would allow Vera and Esther to visit Kirsten. He also admitted to the falsity of the allegation in his petition that Vera would call the police whenever he went to visit Kirsten. Eric identified a court order finding him in arrearage for health insurance payments. He admitted that he did not make the insurance payments but he stated that a mistake had been made in the entry of the order. He also admitted that he did not appeal that order or seek to have it corrected. The parties stipulated that a court order was entered that required Eric to pay Kirsten's estate an arrearage of $17,000.

Vera Howse was called as an adverse witness by Eric's counsel. She testified that she paid the lawyer who prepared Barbara's will two weeks before Barbara died. (The will expressed Barbara's wish that Vera Howse be named Kirsten's guardian of her person.) Upon further examination, Vera stated that she did not tell Barbara what to include in her will and that she and Barbara talked about her taking care of Kirsten as early as two years before Barbara died.

Eric Johnson, Jr., Kirsten's brother, testified as a rebuttal witness. He testified that Vera Howse told him to visit her attorney about pursuing a case against his father for child support. He testified that he had no independent knowledge of child support being owed but attributed difficult times as a child growing up to his father's failure to pay child support.

At the conclusion of the hearing, the court entered an order finding Kirsten to be a disabled person and appointing Vera Howse guardian of Kirsten's person. In making the appointment, the court noted the confusion interjected in the case by the parties by treating the issue of Kirsten's custody as being synonymous with the issue of guardianship of her person. The court noted the failure of both Vera and Eric to have established a future "care plan" for Kirsten. In that regard, the court ordered Vera to provide at the next hearing a professional assessment and evaluation for Kirsten to explore the possibility that Kirsten participate in a supervised community living arrangement. The court also noted that it would revisit the financial and custody issues raised during the case to assure that Kirsten's interests were protected.

In reaching its decision to appoint Vera as Kirsten's guardian of the person, the court noted that it considered Barbara's request in her will that Vera be appointed Kirsten's guardian. The court also stated that it had considered Eric's status as Kirsten's surviving parent. It considered the possibility of appointing the public guardian but elected not to do so due to concern that such an appointment might confuse Kirsten and have a negative effect upon her. The court warned that it would not hesitate to appoint the public guardian as Kirsten's guardian if it believed that Kirsten's needs were not being adequately met by Vera.

## II. DISCUSSION

On appeal, Eric argues that the appointment of Vera Howse as the guardian of Kirsten's person was an abuse of discretion because the trial court failed to give preference to his status as Kirsten's parent and because the court ignored evidence of Vera's financial conflict of interest.

■■ ■ Section 11a—3(a) of the Probate Act of 1977 (the Probate Act) (755 ILCS 5/11a—3(a) (West 1996)) provides as follows:

> "Upon the filing of a petition by a reputable person or by the alleged disabled person himself or on its own motion, the court may adjudge a person to be a disabled person and may appoint (1) a guardian of his person, if because of his disability he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person, or (2) a guardian of his estate, if because of his disability he is unable to manage his estate or financial affairs, or (3) a guardian of his person and of his estate."

The qualifications for a person who wishes to act as guardian are set forth in section 11a—5(a) of the Act as follows:

> "A person who has attained the age of 18 years, is a resident of

the United States, is not of unsound mind, is not an adjudged disabled person as defined in this Act, and has not been convicted of a felony, and who the court finds is capable of providing an active and suitable program of guardianship for the disabled person is qualified to act as guardian of the person and, if he is a resident of this State, guardian of the estate of a disabled person." 755 ILCS 5/11a—5(a) (West 1996).

In selecting the guardian, the court is to give due consideration to the preference of the disabled person. 755 ILCS 5/11a—12(d) (West 1996); *In re Estate of Bania*, 130 Ill. App. 3d 36, 39-40, 473 N.E.2d 489, 492 (1984). Of paramount concern in the selection of a guardian, however, is the best interest and well-being of the disabled person, regardless of that person's choice. *In re Estate of Johnson*, 219 Ill. App. 3d 962, 965, 579 N.E.2d 1206, 1209 (1991) (finding best interest considerations must prevail over preference of disabled person); *Bania*, 130 Ill. App. 3d at 40, 473 N.E.2d at 492; *In re Conservatorship of Browne*, 54 Ill. App. 3d 556, 559, 370 N.E.2d 148, 150 (1977). In that regard, the court may consider such factors as the recommendations of persons with kinship or familial ties, the relationship between the disabled person and the party being considered for appointment, conduct by the disabled person prior to being adjudicated disabled which manifests trust or confidence in the proposed guardian, prior actions by the proposed guardian which indicate concern for the well-being of the disabled person, the ability of the proposed guardian to manage the incompetent's estate, and the extent to which the proposed guardian is committed to discharging responsibilities which might conflict with his or her duties as a guardian. *In re Estate of Vicic*, 79 Ill. App. 3d 383, 385, 398 N.E.2d 420, 421 (1979); *Browne*, 54 Ill. App. 3d at 559-60, 370 N.E.2d at 150. The court's selection of the guardian is discretionary and will not be overturned on appeal absent an abuse of discretion. 755 ILCS 5/11a—12(d) (West 1996); *Bania*, 130 Ill. App. 3d at 39-40, 473 N.E.2d at 492; *Vicic*, 79 Ill. App. 3d at 385, 398 N.E.2d at 422.

Eric, the appellant, argues that the trial court abused its discretion by failing to give preference to his status as Kirsten's father. He contends that such a preference, which is statutorily mandated for issuance of letters of administration under section 9—3 of the Probate Act (755 ILCS 5/9—3 (West 1996)), should also exist with respect to appointment of guardians of disabled persons. See 755 ILCS 5/9—3(e), (g) (West 1996) (giving preference to parents over nearest kindred with respect to issuance of letters of administration). In support of this position, the appellant cites to the concurring opinion in *Browne*, 54 Ill. App. 3d at 561-62, 370 N.E.2d at 151-52 (Barry, J., specially

concurring), and the opinion in *Rathbun v. Rimmerman*, 6 Ill. App. 2d 101, 126 N.E.2d 856 (1955).

While the concurring opinion in *Browne* supports Eric's contention, the majority opinion specifically rejects it. See *Browne*, 54 Ill. App. 3d at 559, 370 N.E.2d at 150 (stating, "the rigid statutory preferences established by section 9—3 do not apply to appointment of conservators"). In reaching that conclusion, the court stated:

> "It should appear evident that the responsibilities of a conservator differ greatly from those of an administrator. The paramount concern in the selection of a conservator is the best interest and well-being of the incompetent. (See Annot., 65 A.L.R.3d 991 (1975).) The differences between administratorship and conservatorship prescribe a rule which avoids any artificial method of determining who is to be conservator and which allows the choice of a conservator based upon the best interest of the incompetent." *Browne*, 54 Ill. App. 3d at 559, 370 N.E.2d at 150.

Accord *In re Estate of Lamont*, 13 Ill. App. 3d 714, 716, 300 N.E.2d 574, 575 (1973) (disapproving of extension of statutory preferences for administrator appointments to appointments of conservators). Applying the "best interest of the incompetent" standard to the facts therein, the *Browne* court affirmed the appointment of the incompetent's attorney as her conservator rather than the public guardian. The court found that the appointment was supported by the fact that the attorney was preferred by the incompetent's relatives, the attorney had performed work for the incompetent at her request before she became incompetent, and the incompetent manifested her trust and confidence in the attorney by previously executing a power of attorney in his favor while she was competent.

Nor does *Rathbun* compel the adoption of Eric's statutory preference contention. In *Rathbun*, the trial court was called upon to choose between the incompetent's first cousin, who was the choice of all of the next of kin of the incompetent, and the pubic guardian. Affirming the appointment of the cousin, the appellate court found it was not an abuse of the trial court's discretion to give preference to the incompetent's relative, stating, "The reasons for giving preference to relatives when an administrator is appointed are applicable upon the appointment of a conservator for an incompetent." *Rathbun*, 6 Ill. App. 2d at 107, 126 N.E.2d at 859. That language in that context does not denote, as Eric contends, that the entire statutory hierarchy of preferences for the issuance of letters of administration, including those with respect to relatives, applies to the appointment of conservators so as to give automatic preference to the father of the incompetent over the aunt of the incompetent. It simply states that there is a

rational basis for preferring relatives over strangers, not that there is a rational basis for necessarily preferring one relative over another. Implicit in *Rathbun* is the court's application of the "best interest of the incompetent" standard to the appointment of a conservator rather than the court's application of absolute preferences mandated by statute with respect to the appointment of an administrator of a deceased person's estate. In that regard, the *Rathbun* court justified the trial court's choice by considering such factors as the existence of a familial relationship between the incompetent and the guardian and the preference of all of the incompetent's relatives. It did not purport to justify the trial court's choice by dogmatic application of the statutory preferences established for issuance of letters of administration. This analysis of *Rathbun* is echoed in *Browne*, which found that *Rathbun* applied the "best interest of the incompetent" standard rather than the statutory preference scheme for issuance of letters of administration. See *Browne*, 54 Ill. App. 3d at 560, 370 N.E.2d at 151 (stating, "the controlling factor in appointing a conservator is what is in the best interest of the incompetent" and finding that a relative "would be more solicitous of the incompetent's well being than would a total stranger").

◼ Here, applying the "best interest of the incompetent" standard to the facts in the instant case, we cannot say that the court's appointment of Vera Howse, Kirsten's aunt, was an abuse of the discretion. The evidence introduced at the hearing showed that Kirsten had lived with Vera shortly before the death of her mother in April 1995 until the time of the hearing. Kirsten had a close and loving relationship with Vera. Vera was Kirsten's primary caregiver and attended to Kirsten's needs, including her medical needs, either directly or with the assistance of those whom Vera solicited. Additionally, Kirsten expressed a desire that Vera be her guardian. See 755 ILCS 5/11a—12(d) (West 1996) (court is to give due consideration to preference of disabled person).

The evidence also shows that Eric, on the other hand, did not visit with Kirsten on a regular basis after his divorce from Barbara and before Barbara's death. Eric attempted to visit Kirsten more regularly after Barbara's death; but, from October 1996 to the time of the hearing in late 1997, his visits with Kirsten became less frequent to the point that he testified that he had seen Kirsten only three times in 1997. It may very well be that Eric's lack of visitation with Kirsten was caused to some extent by Vera. However, it does not appear from the record that Eric actively pursued his right to visitation with Kirsten in 1997 such as by obtaining a court order to enforce his visitation rights. Moreover, there was evidence that a court order had been issued showing Eric to be in arrearage in health insurance

premium payments due and owing prior to Kirsten's attainment of the age of 18. Given these facts, we conclude that the court's discretionary appointment of Vera, who had greater day-to-day involvement in Kirsten's life, as Kirsten's guardian of her person was proper. See *Lamont*, 13 Ill. App. 3d 714, 300 N.E.2d 574 (finding no abuse of discretion with respect to appointment of niece by marriage as incompetent's conservator; niece knew incompetent for 49 years, visited him frequently, helped him with his financial affairs, and incompetent had executed power of attorney in her name).

Eric also contends that the trial court's appointment of Vera as the guardian of Kirsten's person was an abuse of discretion because Vera's financial interests conflicted with Kirsten's interests. In support of this contention he cites to evidence that Kirsten's estate purchased Vera's home and that Vera did not pay rent to Kirsten despite continuing to live in the home with Kirsten and other family members. He cites to evidence that Vera collected rent from Esther and contends that Vera used that money "improperly for her own purposes." He also contends that the evidence showed that Vera used money paid to her by Kirsten's estate for the support of Kirsten to lease a car for her (Vera's) personal use.

■ The law is clear that a person who is appointed by the court to act as the guardian of a disabled person's estate must be free from any interest that would prevent or impair the proper assertion or protection of the incompetent's rights. As stated in *Proehl v. Leadley*, 86 Ill. App. 2d 472, 478, 230 N.E.2d 516, 519 (1967):

> "The paramount duty of the conservator [of the estate] is, as the name implies, to conserve and protect the assets of an incompetent person and to see that such assets and the income therefrom are properly applied to the use, enjoyment and benefit of such incompetent."

Compare 755 ILCS 5/11a—5(a)(1) (West 1996) (charging guardian of the person with making decisions concerning disabled person's care) with 755 ILCS 5/11a—5(a)(2) (West 1996) (charging guardian of estate with managing disabled person's estate and financial affairs). Evidence of fraudulent conduct or bad faith in prior dealings between the proposed guardian and the incompetent will preclude his or her selection as guardian. *In re Estate of Robertson*, 144 Ill. App. 3d 701, 712, 494 N.E.2d 562, 570 (1986); *Lamont*, 13 Ill. App. 3d 714, 300 N.E.2d 574; *Proehl*, 86 Ill. App. 2d 472, 230 N.E.2d 516. Although *Robertson*, *Lamont*, and *Proehl* each involved the appointment of the guardian of the estate (*Robertson*, 144 Ill. App. 3d at 712, 494 N.E.2d at 570 (individual appointed guardian of person and estate); *Lamont*, 13 Ill. App. 3d 714, 300 N.E.2d 574 (individual appointed guardian of person and

estate); *Proehl*, 86 Ill. App. 2d 472, 230 N.E.2d 516 (individual appointed guardian of estate)), it would seem that the guardian of the person should likewise be free from pecuniary interests that conflict with those of the disabled person. See *Bania*, 130 Ill. App. 3d 36, 473 N.E.2d 489 (directly on point).

In *Bania*, the trial court appointed separate individuals to act as the guardian of the person and guardian of the estate. The court appointed the disabled person's great niece to act as the guardian of her person and rejected the wife of the nephew of the disabled person because evidence was presented that cast doubt upon her motives and freedom from self-interest. That evidence showed that the nephew's wife took the disabled person to the bank, where she had funds totalling $150,000 to $200,000, shortly after being discharged from the hospital. The nephew's wife, although present at the hearing, did not testify to explain the reason for the trip to the bank. Based upon this unexplained trip and the failure to testify, the trial court refused to appoint the nephew's wife as guardian of the person despite the disabled person's expressed preference for that appointment. The appellate court affirmed that decision finding ample support in the record for the trial court's discretionary rejection of the nephew's wife. *Bania*, 130 Ill. App. 3d at 40, 473 N.E.2d at 492.

■ Here, as in *Bania*, the trial court made separate appointments for guardian of the disabled person and guardian of the estate of the disabled person.[4] However, unlike in *Bania*, the trial court did not find that Vera's motive in seeking appointment as guardian of Kirsten's person was based upon self-interest or improper motive. Implicit in the trial court's appointment of Vera as the guardian of Kirsten's person is the finding that Vera was free from conflicting pecuniary interests. In that regard we note that, in rendering its decision, the court specifically stated that it would not appoint a person who had financial conflicts with Kirsten's estate. Also, as discussed above, the sale of Vera's home to Kirsten's estate, while benefiting Vera, most certainly benefited Kirsten and was in her best interest at the time of purchase. The record indicates that Vera would have been required to sell her house to a stranger if Kirsten's estate had not intervened to purchase it. Kirsten and her mother were living in the house at the time the house was put on the market for sale, and the purchase of the house by a stranger would have resulted in the uprooting of Kirsten and her family at a difficult time in their lives. The record also shows that Kirsten's estate purchased Vera's house at the sugges-

---

[4]As noted in footnote 1, Suburban Bank & Trust Company was appointed guardian of Kirsten's estate.

tion of Kirsten's mother shortly before her death. Kirsten's mother was guardian of Kirsten's person at that time, and the sale was approved by the court.

Vera's failure to remit rental payments to Kirsten's estate also does not compel a finding of improper motive. Vera is Kirsten's primary caregiver and is not paid a monthly stipend by the estate for her services to Kirsten. This lack of payment, combined with facts that Vera personally paid for new roofing expenses ($3,900) and kitchen cabinet resurfacing expenses ($4,000) and intended to pay for remodeling expenses (estimated to be $17,800) supports the conclusion that Vera was not taking advantage of Kirsten. Vera also was not receiving any windfall from the receipt of $150 per month from Esther and $500 per month from Kirsten's estate for Kirsten's care. Vera testified that she used the $500 support money and $150 rent money from Esther to pay for utilities and food, clothing for Kirsten, and a car lease. While Vera used the car for personal purposes, there is no question that Kirsten benefitted from the car in that she was taken by car to various churches to participate in services and choir activities. We also note that, at the time of the hearing, Vera was no longer receiving the $500-per-month payments because Kirsten had attained the age of 18.[5] Finally, and most importantly, there was clear evidence of a long-standing and loving relationship between Vera and Kirsten. Under these circumstances, as well as the fact that Eric also had financial conflicts in that he was a judgment creditor of Kirsten's estate, we cannot say that the court's appointment of Vera, rather than Eric, as Kirsten's guardian of the person was an abuse of discretion.

In reaching this conclusion, we note, however, that the trial court indicated that there would be future review of the living arrangements in the Matteson house and the financial issues related thereto. The court also ordered Vera to investigate the possibility that Kirsten participate in a supervised community living program. If participation in such a program were found to be in Kirsten's best interest, the court could thereupon order the sale of the Matteson house (presuming Kirsten's full-time residence elsewhere) or order Vera and Esther to pay rent to Kirsten's estate were they to remain in the Matteson house in Kirsten's absence. Clearly, Kirsten's financial interests have not been jeopardized and there is no indication that they will be jeopardized in the future.

For the foregoing reasons, the order of the Circuit Cook of Cook

---

[5]Although not in the record, at oral argument counsel for Vera stated, without objection, that support payments by Kirsten's estate to Vera resumed after the hearing on the guardianship petitions filed by Vera and Eric.

County appointing Vera Howse the guardian of the person of Kirsten Johnson is affirmed.

Affirmed.

RAKOWSKI and McNULTY, JJ., concur.