2024 IL App (1st) 221732-U

FOURTH DIVISION
Order filed May 23, 2024

No. 1-22-1732 & 1-23-0756 cons.

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| IN RE AMANDA WILLIAMS, a disabled person | ) | Appeal from the |
| | ) | Circuit Court of Cook |
| (William Lee, | ) | County. |
| | ) | |
| Petitioner-Appellant | ) | |
| | ) | |
| v. | ) | No. 11 P 873 |
| | ) | |
| Renada Skinner and Midwest Care Management, NFP, | ) | Honorable |
| | ) | Shauna L. Boliker, |
| Cross petitioners- Respondents-Appellees) | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Rochford and Justice Ocasio concurred in the judgment.

**ORDER**

¶ 1 *Held*:     We affirmed the appointment of a successor guardian for a person with a disability where the circuit did not abuse its discretion in choosing a professional guardian over an unrelated individual with no relevant experience and a limited relationship with the person with a disability. We also affirmed the circuit court's order denying the non-guardian brother's request for standing and notice of proceedings after his petition for the appointment of a successor guardian was denied.

¶ 2 Petitioner William Lee, (William) appeals from an order of the circuit court appointing Midwest Care Management, NFP (Midwest) as successor plenary guardian for his sister Amanda Williams (Amanda), a disabled person. U.S. Bank is the guardian of Amanda's estate, and Renada Skinner (Renada) petitioned for the appointment of Midwest. On appeal, William argues that the circuit court abused its discretion when it appointed Midwest rather than Amber White (Amber), the guardian he proposed. In these consolidated appeals, William also argues that the circuit court erred when it failed to accord him standing as an "interested person" and order that he be provided with notice of any filing by Midwest. For the reasons that follow, we affirm.

¶ 3 Amanda was born in 1992. When she was four years old, she suffered an anoxic brain injury on Chicago Transit Authority property and received a significant settlement. In 2020, the value of her estate including a single-family house in Flossmoor was over $4.5 million. Initially, her mother JoAnn Williams (JoAnn) was appointed guardian of her person and U.S. bank as the guardian of her estate. According to a budget approved by the circuit court in 2011, the estate paid all of Amanda's expenses including the mortgage on the house in Flossmoor, utilities, taxes, insurance, and medical expenses. The estate also paid JoAnn $2500 monthly to cover the cost of food, gasoline, recreation, entertainment, and other expenses.

¶ 4 In February 2020, William filed, as an interested party, an emergency motion to suspend the letters of office issued to JoAnn and appoint Toriana Lee (Toriana), William's daughter, as Amanda's temporary guardian. The petition alleged that JoAnn was receiving $2500 monthly from the estate for the care of Amanda and an additional $2900 monthly to act as Amanda's caregiver. William alleged that he had seen JoAnn using heroin when Amanda was present in the next room and that, when she was under the influence of heroin, she was not properly caring for Amanda.

¶ 5     On February 26, 2020, the circuit court appointed Adam Stern as a guardian *ad litem* (GAL) for Amanda and appointed Toriana as temporary guardian of Amanda's person. The circuit court issued a citation to remove JoAnn as Amanda's guardian, suspended the caregiving payments, and redirected the care and maintenance payments to Toriana. JoAnn entered drug rehabilitation, but suffered a heart attack and died on March 11, 2020.

¶ 6     On June 19, 2020, the GAL filed an "emergency report," stating that Amanda was living in the Flossmoor house along with Toriana and William. William's father and other children may also have been living in the house. At 6 a.m. on June 18, 2020, pursuant to a search warrant, law enforcement officers "raided" the house in Flossmoor. Amanda was home when the raid started, but was taken to Toriana's mother's house for more than eight hours while the officers searched the house. Numerous items were seized including phones, a computer, papers and Amanda's iPad. At the GAL's request, Moira Brennan, a case manager from Rehab Assist, visited the house after Amanda returned. Amanda remembered that the police were there in the morning and was upset that they took her iPad, but appeared calm to Brennan. The GAL recommended that Toriana not be reappointed as Amanda's temporary guardian and that a nonrelative be appointed.

¶ 7     On June 23, 2020, Renada filed a petition for the appointment of Midwest as the guardian of Amanda's person. Although the order does not appear in the record, the parties do not dispute that Midwest was appointed temporary guardian of Amanda's person.

¶ 8     On September 11, 2020, William filed a cross-petition for the appointment of Toriana as the guardian of Amanda's person. However, on October 14, 2020, William moved for leave to file an amended-cross petition seeking the appointment of Amber as guardian of Amanda's person. On October 20, 2020, the circuit court granted William leave to file the amended petition.

¶ 9    On June 29, 2021, the circuit court commenced a hearing on the competing petitions The hearing was conducted over more than twenty dates and concluded on October 18, 2022. The hearing began with William's case in chief.

¶ 10    Reanda testified that Amanda was her first cousin. Reanda helped care for her aunt JoAnn, cleaning, helping JoAnn into the shower, and driving Amanda to the doctor. Reanda filed a petition to nominate a guardian for Amanda after the police raid at the Flossmoor house. Reanda testified that she nominated Midwest because she thought they could "give structure" and help the family. Reanda stated that she did not know how many caregivers Midwest had used to care for Amanda. She added that Amanda attended Sylvan Learning Center (Sylvan)  twice weekly and had weekly counseling sessions.

¶ 11    Reanda testified that Amanda was living in a two-bedroom apartment and had a bedroom to herself.  According to Renada, in October 2020, Amanda asked to go "home," but did not ask to go home after that.

¶ 12    Renada stated that William organized a balloon release for the anniversary of JoAnn's death. Midwest did not do anything to commemorate the anniversary of JoAnn's death or her birthday. She added that Midwest did recognize Amanda's birthday and Christmas. Reanda testified that Midwest had not done anything to foster Amanda religious or spiritual needs.

¶ 13    On cross-examination, Reanda testified that William saw Amanda twice in 2018, and that he was not involved in her life prior to filing his petition to remove JoAnn as guardian. After Toriana was appointed temporary guardian, William, his wife, son, two daughters, and father all moved into the Flossmoor house. Reanda stated that she never met Amber at the home when she visited in 2018 or 2019.

¶ 14    Dr. Michelle Henry testified that she had been Amanda's "temporary guardian" since June 2020. In that role, she oversees Amanda's care and manages her caregivers. Amanda attends Sylvan twice weekly where she is learning math and reading, and she engages in therapy once a week. According to Dr. Henry, Amanda engages in activities such as going to movies, shopping, and the zoo.

¶ 15    Dr. Henry stated that Amanda's caregivers were provided through All Trust Home Care. Amanda has had between 17 and 20 caregivers. Amanda told Dr. Henry that she was closer to some caregivers than others and that she has to get used to having different caregivers. Amanda said that she did not want to be at the apartment and wanted to go back to the house in Flossmoor. Dr. Henry testified that as guardian she had a responsibility for assuring that a ward has spiritual and religious development, "if they want it." However, when asked, Amanda said she was not interested in church.

¶ 16    Dr. Henry testified that Amanda was removed from the Flossmoor home to an apartment because the house was filthy, and Amanda gave Dr. Henry the impression that she "didn't want to be bothered with the number of people." Dr. Henry was also concerned that Amanda was not being properly supervised and was leaving the house on her own.

¶ 17    Shirley Shively testified that she knew Amanda because JoAnn was her best friend. When Amanda had her accident, she was at the hospital every day with JoAnn. Shively testified that she and JoAnn moved to the house in Flossmoor when Amanda was approximately eight years old. William's father also moved into the house with JoAnn and Amanda. According to Shively, Amanda loved the Flossmoor house, it was like a playground for her. Amanda knew everyone in the Flossmoor neighborhood.

¶ 18    Shivley further testified that Amanda was depressed and confused after JoAnn's death. She visited Amanda after she moved to the apartment and found her unusually lethargic and could not keep her head up. Amanda "constantly" told Shivley that she wanted to go home.

¶ 19    Amber White testified that she lives in Pheonix, Illinois and works as a school bus driver. She first met Amanda when she was 11 or 12 years old.  According to Amber, she would see Amanda when she visited with Shivley and JoAnn. After Dr. Henry began allowing visits during the pandemic, she took Shivley to visit Amanda. Amanda seemed different; she was "kind of like standoffish."

¶ 20    Amber testified that, if she were appointed Amanda's guardian, the first thing she would do is interview her doctors and counselors. She  would ensure that Amanda gets to her appointments. Amber planned to move Amanda back to the Flossmoor home and supervise Amanda herself "24/7." She thought it was important that Amanda have access to her family.  She stated that she would take Amanda to church with her brother if she wanted to go.  She  would use caregivers, if she could, to run errands or if she needed to do something. Amber expected to quit her job to give Amanda her full attention and anticipated receiving "some kind of stipend" to pay her own bills.

¶ 21    On cross-examination, Amber admitted that she had only visited Amanda three times in the past five months since she was nominated as guardian and had never gone by herself. She admitted that she had no specialized training that would assist her in caring for Amanda.

¶ 22    Stern testified that he had met with Amanda six or seven times; two visits at the Flossmoor house and the remainder at the apartment. Stern had several conversations with Dr. Henry about the number of caregivers being used and testified that, "in a perfect world," Amanda would have more consistency.

¶ 23 On cross-examination, Stern testified that he thought Amber should meet with Amanda more if she wished to become her guardian. He also testified that he thought Amber's care plan was "very loose," impractical, and unrealistic.

¶ 24 William testified that he was Amanda's brother. He acknowledged that he was convicted of possession of a stolen motor vehicle and delivery of a controlled substance in 1999, and unlawful use of a weapon in 2010. In 2000 or 2001, Amanda and JoAnn moved into the house in Flossmoor, and he moved there about eight months later after being paroled from prison. He continued living in the Flossmoor house until October 2020 after Amanda moved to the apartment.

¶ 25 According to William, in November 2020, he visited Amanda at her apartment with Shively. Amanda was drowsy during the visit and could not keep her head up. When he asked her a question, Amanda would look at Dr. Henry before answering. Amanda did not seem happy. William stated that, in October 2021, he held a birthday party for Amanda at his house.

¶ 26 William testified that he nominated Amber as Amanda's guardian because she was a mother figure, loving and caring. William believed that Amber would create a home environment for Amanda. He proposed a care plan with Amber as the guardian, Amber would quit working and be a full-time caregiver, and Amanda would move back to the Flossmoor house. Amanda's family would help with her care but would not move back into the Flossmoor house. William felt that under the current care plan Amanda was a "hostage" in her apartment. In addition, he was concerned about the number of caregivers being used to care for Amanda.

¶ 27 On cross-examination, William testified that he kept a room at the Flossmoor house, but that he only visited two or three times weekly. William denied petitioning to have his mother's

guardianship suspended so he could move his family into the Flossmoor house. He testified that after Toriana was appointed temporary guardian, he stayed at the house more frequently to help out.

¶ 28    On December 15, 2021, Midwest, through its attorney, informed the court that Amanda would be moving back into the Flossmoor house. Midwest proposed that its care plan would remain the same with two shifts of caregivers.

¶ 29    On January 25, 2022, Ranada commenced her case in chief. Benjamin Topp testified that he was the president and managing director of Midwest. Since 2010, when the company was formed, Midwest had served over 1200 clients with disabilities, including mental illness, developmental disabilities and traumatic brain injuries. The court found Topp to be an expert in the field of case management for persons with disabilities.

¶ 30    Topp testified that Midwest was the temporary guardian for Amanda. Dr. Henry was Amanda's case manager and reported directly to him. Topp believed Dr. Henry was a good choice because she had a Ph.D. and a master's degree in counseling and had experience working with complex family systems and younger clients. According to Topp, Amanda has a high-level of functioning, is mobile, and independent in her activities of daily living. However, Amanda has some memory impairment, has trouble sleeping, can be impulsive, and has threatened to elope. Topp opined that Amanda needed 24-hour supervision, but, because of her sleep disturbances, a live-in caregiver could not provide her with appropriate supervision. Instead, Midwest used two shifts of caregivers seven days a week.

¶ 31    On cross-examination Topp admitted that both Midwest's amended care plan and William's plan provided that Amanda would live in the Flossmoor home. Topp also admitted that Amanda was

unhappy living in the apartment. He opined that a guardian should adjust a care plan according to the client's needs and wishes.

¶ 32    Dr. Henry was recalled as a witness for Renada. Dr. Henry stated that, as she was formulating the initial care plan, she learned that Amanda had not seen a doctor for more than six years, and she was not receiving any psychiatric or therapeutic intervention.

¶ 33    Dr. Henry testified that she created a care plan for Amanda in July, 2020. At that time Amanda was living the Flossmoor house. William, William's father, his wife, and daughter were living in the house along with Toriana. There was a total of five adults living in the three-bedroom house. On her first visit, Dr. Henry found the house to be "fairly clean," but there were occasions when she observed the bathroom to be dirty and saw dog feces on the floor.  Dr. Henry stated that she recommended moving Amanda to a two-bedroom apartment because of the condition of the home and because the number of people living in the home was an impediment to improving its condition. She was also informed that there were parties or gatherings at the Flossmoor house. Dr. Herny was concerned because, at that time the Center for Disease Control was recommending that people wear masks, she observed two or three additional children visiting the house that were not wearing masks. According to Dr. Henry, Amanda told her that she did not feel like the Flossmoor house was "her home," and she did not want to be there with a number of people. Dr. Henry wanted to honor Amanda's wishes and provide a healthier environment for her.

¶ 34    Dr. Henry testified that Amanda told her that she does not like going to William's home but looks forward to visiting with Renada and enjoys spending time with her.  According to Dr. Henry, Amber has only visited Amanda approximately five times. Dr. Henry added that Amanda said that she doesn't know who Amber is.

¶ 35    Dr. Herny stated that the "caregiver model" in place for Amanda is two 12-hour shifts each day. She opined that under that model an ideal number of caregivers would be four or five.

¶ 36    On cross-examination, Dr. Henry testified that Amanda had had 54 caregivers between June 2020 and June 2022.  She stated that Amanda told her that she does not like "all these people."

¶ 37    Renada next called Stern, the GAL to testify. Stern opined that Midwest should be appointed as Amanda's plenary guardian because Midwest had the skills necessary to navigate the needs of Amanda and her family. The family dynamics were troubling at times and there was a lot of pressure on Amanda. Stern added that Amber seemed like a "nice lady," but that he thought a third party with professional skills and resources should be appointed.

¶ 38    On cross-examination, Stern admitted that the number of caregivers used by Midwest was "higher than what is in the best case scenario," but that it was in Amanda's best interest not to be alone.

¶ 39    The parties presented closing arguments, and the circuit court took the matter under advisement. On October 18, 2022, the circuit court entered  an order appointing Midwest as Amanda's plenary guardian. William asked that the order designate him as an "interested person," entitled to receive all notices going forward, and that he be allowed to "weigh in" on any matters raised in the pleadings. The circuit continued the matter of William's status as an interested person. William timely filed a notice of appeal (No. 1-22-1732) pursuant to Illinois Supreme Court Rule 304(b) (eff. March 8, 2016) directed at the circuit court's order appointing Midwest as Amanda's plenary guardian.

¶ 40    On October 21, 2022, William filed a written request to be granted standing to participate in the proceedings.  On November 18, 2020, Midwest responded to William's request arguing, *inter alia,* that:

> "William Lee is essentially asking to be made a party to the estate administration for guardianship of Amanda Williams, but has provided no statutory basis or case law to support his standing."

U.S. Bank also responded, arguing that:

> "William Lee is not an interested person in this estate. He has no financial interest, property right or fiduciary status in the estate. The assets of this estate arc solely for the benefit of Amanda Williams. William Lee is not an heir of the estate; Amanda Williams is not deceased and at present has no heirs. Furthermore, William Lee does not have fiduciary status; he is not a guardian of the person or a guardian of the estate of Amanda Williams. William Lee is not an interested person as defined in the Probate Act"

¶ 41    On April 5, 2023, the court denied William's request, concluding: "To grant William Lee standing is contrary to statutory law and well established case law, and as this court has said many times, it is not in the best interest of Amanda Williams or her Estate." William filed a second notice of appeal (No. 1-23-0756). We consolidated William's two appeals.

¶ 42    We turn first to the appointment of Midwest as plenary guardian. William contends that the appointment was an abuse of discretion, arguing  that Midwest moved Amanda from her childhood home to an apartment and failed to work with her family to recognize events like the anniversary of JoAnn's death. Midwest responds arguing, *inter alia*, that it had a long history of meeting Amanda's

needs and had demonstrated a commitment to doing so in the future. For the reasons that follow we affirm the appointment of Midwest as guardian of Amanda's person.

¶ 43    Section 11a-3 of the Probate Act of 1975 (Act) (755 ILCS 5/11a-3 (West 2022) allows the circuit court to appoint a guardian for disabled person. Here, Amanda was previously adjudicated a disabled person, and the parties do not dispute the need for a guardian of her person. The parties also do not dispute the continued appointment of U.S. Bank as the guardian of Amanda's estate. The only question before the circuit court was the competing petitions for appointment of a successor guardian of Amanda's person.

¶ 44    Section 11a-12 of the Act provides that:

> "The selection of the guardian shall be in the discretion of the court, which shall give due consideration to the preference of the person with a disability as to a guardian, as well as the qualifications of the proposed guardian, in making its appointment. However, the paramount concern in the selection of the guardian is the best interests and well-being of the person with a disability." 755 ILCS 5/11a-12 (West 2022)

To be qualified to serve, the proposed guardian must: (1) be capable of providing an active and suitable program of guardianship for the disabled person; (2) be at least 18 years old; (3) be a resident of the United States; (4) be of sound mind; and (5) generally have not been convicted of a felony. *In re Estate of McHenry*, 2016 IL App (3d) 140913, ¶ 141. Although the circuit court is required to give due consideration to the wishes of the disabled person regarding the choice of guardian, it is not bound by that preference. *Id.* The circuit court must also consider the proposed guardian's qualifications. *Id.* However, the primary consideration remains the best interests and well-being of

the disabled person. *Id.* The decision in *McHenry* identifies six factors a circuit court may consider in appointing a guardian:

"(1) the degree of relationship between the disabled person and the proposed guardian; (2) the recommendations of persons with kinship or familial ties to the disabled person; (3) conduct by the disabled person prior to the adjudication demonstrating trust or confidence in the proposed guardian; (4) prior conduct by the proposed guardian indicating a concern for the well-being of the disabled person; (5) the ability of the proposed guardian to manage the disabled person's estate (the proposed guardian's business experience and other factors); and (6) the extent to which the proposed guardian is committed to discharging any responsibilities which might conflict with his or her duties as a guardian." *Id.* (citing *In re Estate of Johnson*, 303 Ill. App. 3d 696, 705 (1999)).

¶ 45　The first factor for consideration favored the appointment of Midwest over Amber. Midwest had been serving as temporary guardian for more than a year prior to its appointment as plenary guardian. Amber had no strong family relationship with Amanda and had only visited her three to five times during the pendency of the cross-petitions.

¶ 46　The second factor does not strongly favor either Amber or Midwest. Although William clearly preferred Amber over Midwest, Renada's cross-petition recommended Midwest.

¶ 47　Amanda was adjudicated a disabled person long before the choice between Midwest and Amber arose, and was never able to demonstrate trust or confidence in either. Therefore, the third factor does not favor either nominated guardian.

¶ 48　The fourth factor strongly favors Midwest. Midwest had served as temporary guardian and had initiated medical care and counseling for Amanda, enrolled her in tutoring at Sylvan, and

arranged for twenty-four hour a day caregivers. Amber on the other hand had only visited Amanda sporadically and had never demonstrated significant concern for Amanda's well-being prior to being nominated as guardian.

¶ 49    As to the fifth and sixth factors, William argues they are irrelevant, because they are directed at the qualifications of a guardian to handle the financial affairs of a disabled person and there was no dispute that U.S. Bank should remain as guardian of Amanda's estate. We agree and find it unnecessary to address these factors individually.

¶ 50    The most important consideration remains the best interests and well-being of Amanda. The circuit court found Midwest was in a better position to provide for Amanda's needs. There was evidence to support that determination. Midwest had provided care for Amanda for over a year; attended to her medical needs, counseling, and tutoring; moved Amanda to an apartment when the home in Flossmoor was overcrowded and dirty; and returned her to that home after conditions improved. Amber on the other hand, had only sporadically visited Amanda, and had proposed a care plan that the GAL described as loose and impractical.

¶ 51    William argues that he "consistently showed himself as a caring older brother." He organized a memorial for the anniversary of his mother's death, cared for Amanda when they lived together, and took her on a family vacation. However, we must recognize that William was not the nominated guardian, Amber was. Therefore, we find that evidence of William's role in Amanda's life is less relevant than evidence of Amber's role.

¶ 52    William also criticizes Midwest for its decision to move Amanda from the Flossmoor house to an apartment and then back to the Flossmoor house. Midwest argues that the decisions reflect a willingness to adapt the care plan for Amanda in response to changing circumstances. The decision

to move Amanda to an apartment was prompted by the large number of people living in the house and the conditions in the house. The move back to Flossmoor was prompted when the house had been vacated, cleaned, and repaired. The circuit court was aware of the circumstances surrounding Midwest's decision to move Amanda to and from an apartment but nevertheless found Midwest to be the best qualified to act as Amanda's guardian.

¶ 53    William also argues that Midwest used an excessive number of caregivers. Dr. Henry and the GAL acknowledged that the number of caregivers was more than "ideal." The turnover in caregivers is troubling, but the circuit court was aware of the problem and still decided to appoint Midwest. We cannot conclude that the circuit court's decision was an abuse of discretion simply because there was evidence that the care plan could be better implemented by using fewer caregivers.

¶ 54    We review the decision of the circuit court to appoint a guardian against an abuse of discretion standard. *McHenry*, 2016 IL App (3d) 140913, ¶ 139. An abuse of discretion will be found only where the circuit court's decision is arbitrary, fanciful, or unreasonable, or when no reasonable person would have taken the view adopted by the circuit court. *Id.*

¶ 55    We have considered all of the evidence and the parties' arguments and are unable to find that the circuit court's appointment of Midwest that was arbitrary or fanciful. Therefore, we cannot conclude that the appointment of Midwest as guardian of Amanda's person was an abuse of discretion.

¶ 56    William next contends that the circuit court erred when it denied his petition to be deemed an interested person for the purpose of notice. William contends that he is an interested person under the definition set forth in section 1-2.11 of the Act (755 ILCS 5/1-2.11 (West 2022)) because he is Amanda's heir. We disagree.

¶ 57    The question of whether the Act confers standing on a person is a matter of statutory interpretation that we review *de novo*. See *Martinez v. City of Springfield*, 2022 IL App (4th) 210290, ¶ 26. Section 1-2.11 of the Act defines an interested person as:

> "one who has or represents a financial interest, property right or fiduciary status at the time of reference which may be affected by the action, power or proceeding involved, including without limitation an heir, legatee, creditor, person entitled to a spouse's or child's award and the representative." 755 ILCS 5/1-2.11 (West 2022)

Although William asserts that he is an "heir" within the meaning of section 1-2.11, "no one can be the heir of a living person." *Dempsey v. Dempsey*, 342 Ill. App. 3d 969, 974 (2003). Therefore, William does not have a present financial interest in Amanda's estate. Accordingly, the circuit court did not err when it denied him standing to receive notice of all actions by Midwest.

¶ 58    For the foregoing reasons, we conclude that the circuit court did not abuse its discretion when it appointed Midwest as guardian of Amanda's person. We further conclude that William was not entitled to standing as an interested person in the guardianship proceedings. Therefore, we affirm the orders of the circuit court.

¶ 59    Affirmed.